Robert BRZOSKA and Mary Ann Brzoska, his wife, et al., Plaintiffs Below, Appellants,

v.

Edward P. OLSON, Administrator of the Estate of Raymond P. Owens, Defendant Below, Appellee.

No. 284, 1994.

Supreme Court of Delaware.

Submitted: May 25, 1995.

Decided: Sept. 8, 1995.

Marla Rosoff Eskin (argued), and Thomas C. Crumplar, Jacobs & Crumplar, P.A., Wilmington, for Appellants.

Mark L. Reardon (argued), William F. Taylor, Jr. and W. Christopher Componovo, Elzufon, Austin & Drexler, P.A., Wilmington, for Appellee.

F.L. Peter Stone, Connolly, Bove, Lodge & Hutz, Wilmington, for Amicus Curiae, Delaware State Dental Society.

Before VEASEY, C.J., WALSH, HOLLAND, and BERGER, JJ., and DUFFY, Justice, Retired,* constituting the Court en Banc.

WALSH, Justice, for the majority:

In this appeal from the Superior Court, we confront the question of whether a patient may recover damages for treatment by a health care provider afflicted with Acquired Immunodeficiency Syndrome ("AIDS") absent a showing of a resultant physical injury or exposure to disease. The appellants, plaintiffs below, are 38 former patients of Dr. Raymond P. Owens, a Wilmington dentist who died of AIDS on March 1, 1991. In an action brought against Edward P. Olson, the administrator of Dr. Owens' estate, the plaintiffs sought recovery under theories of negligence, battery, and misrepresentation. After limited discovery, the Superior Court granted summary judgment in favor of Dr. Owens' estate, ruling that, in the absence of a showing of physical harm, plaintiffs were not entitled to recover under any theory advanced. Plaintiffs have appealed only the rulings disallowing recovery on the claims of battery and misrepresentation.

We conclude that the Superior Court correctly ruled that, under the circumstances of Dr. Owens' treatment, there can be no recovery for fear of contracting a disease in the absence of a showing that any of the plaintiffs had suffered physical harm. Specifically, plaintiffs cannot recover under battery *as a matter of law* because they could not show that their alleged offense was reasonable in the absence of being actually exposed to a disease-causing agent. We further conclude, however, that, as to those plaintiffs to whom Dr. Owens made a direct representation that he did not suffer from AIDS and thereafter rendered treatment, the facts of record, when viewed from the plaintiffs' perspective, preclude the grant of summary judgment, if recovery is limited to economic damages.

Accordingly, we affirm in part and reverse in part the decision of the Superior Court and remand for further proceedings the claim of fraudulent representation as to those plaintiffs who have standing to assert such a claim.

I

Prior to his death, Dr. Owens had been engaged in the general practice of dentistry in the Wilmington area for almost 30 years. Although plaintiffs have alleged that Dr. Owens was aware that he had AIDS for at least ten years, it is clear from the record that it was in March, 1989, that Dr. Owens was advised by his physician that he was HIV-positive.[1] Dr. Owens continued to practice, but his condition had deteriorated by the

---

* Sitting by designation pursuant to Supreme Court Rule 2 and Del. Const. art. IV., §§ 12 and 38.

1. We take judicial notice of the following facts as derived from reputable scientific journals and well-accepted knowledge in the scientific community. AIDS is a viral disease that weakens or destroys the body's immune system. It is caused by Human Immunodeficiency Virus ("HIV").

summer of 1990. Toward the end of 1990, he exhibited open lesions, weakness, and memory loss. In February, 1991, his physician recommended that Dr. Owens discontinue his practice because of deteriorating health. Shortly thereafter, on February 23, Dr. Owens was hospitalized. He remained hospitalized until his death on March 1, 1991.

Shortly after Dr. Owens' death, the Delaware Division of Public Health (the "Divi-

sion") undertook an evaluation of Dr. Owens' practice and records, in part to determine if his patients had been placed at risk through exposure to HIV. The Division determined that Dr. Owens' equipment, sterilization procedures and precautionary methods were better than average and that he had ceased doing surgery since being diagnosed as HIV-positive in 1989.[2] Although the Division determined that the risk of patient exposure

HIV attacks the body's T–Lymphocyte cells, a critical part of the body's immune system. At least presently, AIDS is invariably fatal. The virus can survive only in the habitat of bodily fluids. Although HIV is present to some degree in every bodily fluid of those who are infected, the only fluids which can transmit the virus are blood, semen, vaginal fluids and breast milk. Centers for Disease Control, *Recommendations for Prevention of HIV Transmission in Health–Care Settings*, 36 MORBIDITY & MORTALITY WKLY.REP. 35 (Supp. No. 2S 1987). For example, because of the existence of anti-bodies and the low presence of titers, saliva is not an effective means of transmission of HIV and may actually inhibit its transmission. See Nancy Mueller, *The Epidemiology of the Human Immunodeficiency Virus Infection*, 14 LAW, MED. & HEALTH CARE 250, 256 (1986); P. Fox, *et al.*, *Salivary Inhibition of HIV–1 Infectivity: Functional Properties and Distribution in Men, Women and Children*, 118 J.AM.DENTAL ASS'N (JADA) 709 (1989). The virus is transmitted primarily by direct blood-to-blood contact or by the exchange of other bodily fluids with an infected individual. Generally, for transmission to occur, the infected fluid of the carrier must pass through some channel of infection and reach the bloodstream of the transferee.

The normal modes of HIV transmission are sexual contact, the sharing of HIV contaminated intravenous needles and syringes, transfusions of tainted blood or its components, and from mother to infant during pregnancy or birth. See Donald Hermann & William Schurgin, *et al.*, *Legal Aspects of AIDS*, §§ 1:05–1:07 (1991); Jay A. Levy, *Human Immunodeficiency Viruses and the Pathogenesis of AIDS*, 261 JAMA 2997, 2998–3991 (1989). Since intact skin is an absolute barrier to the virus, casual contact, social contact and skin-to-skin contact do not pose a risk of HIV transmission. United States Health Service, *Surgeon General's Report on Acquired Immune Deficiency Syndrome* 13–14 (1986). For HIV to be transmitted from an infected dentist to a patient in a dental setting, therefore, the dentist's infected blood must come into contact with either the blood or a mucous membrane of the patient. Affidavit of Dr. Paul A. Silverman, State Epidemiologist, Division of Public Health, State of Delaware.

**2.** The United States Department of Health and Human Services Centers for Disease Control

("CDC") issues voluntary health care worker ("HCW") guidelines designed to prevent transmission of HIV between such workers and their patients during invasive medical and dental procedures. In 1983, the CDC published advisory precautionary measures for HCWs to reduce the risk of HIV transmission. *Acquired Immune Deficiency Syndrome (AIDS): Precautions for Health–Care Workers and Allied Professionals*, 32 MORBIDITY & MORTALITY WKLY. REP. 450 (1983). In 1985 and 1987, the CDC again published recommended guidelines to prevent the transmission of HIV. *Recommendation for Preventing Transmission of Infection with Human T–Lymphotropic Virus Type III/Lymphadenopathy Associated Virus in the Workplace*, 34 MORBIDITY & MORTALITY WKLY. REP. 691 (1985); *Update: Universal Precautions for Prevention of Transmission of Human Immunodeficiency Virus, Hepatitis B Virus, and other Blood Borne Pathogens in Health–Care Settings*, 37 MORBIDITY & MORTALITY WKLY. REP. 379 (1987).

On July 12, 1991, four months after Dr. Owens died from AIDS, the CDC issued comprehensive guidelines concerning the practice of HIV-infected HCWs with their patients. *Recommendations for Preventing Transmission of Human Immunodeficiency Virus and Hepatitis B Virus to Patients During Exposure–Prone Invasive Procedures*, 40 MORBIDITY & MORTALITY WKLY. REP. RR–8, 1–9 (1991). In light of its determination that the risk of doctor-to-patient transmission of HIV is at most a small one, the CDC recommended that HIV-positive HCWs not be barred from performing most procedures. *Id.* at 5. Instead, it recommended strict adherence to universal precautions, an approach to infection control where all human blood and certain human body fluids be treated as if infectious for HIV and other blood-borne pathogens. Such precautions include hand-washing, wearing protective barriers such as gloves and masks, and care in the use of needles and other sharp instruments. *Id.* If followed, the CDC concluded that the practice of HIV-infected HCWs who perform invasive procedures should not be restricted. *Id.* It also recommended that HIV-positive HCWs obtain the approval of a review panel of experts and the consent of the patient before performing "exposure-prone" procedures.

Characteristics of exposure-prone procedures include digital palpation of a needle tip in a body cavity or the simultaneous presence of the

was "very small," it notified all patients treated by Dr. Owens from the time of his 1989 diagnosis until his death that their dentist had died from AIDS and that there was a possibility that they were exposed to HIV. The Division also advised the former patients that they could participate in a free program of HIV testing and counseling. Some patients availed themselves of the Division's testing while others secured independent testing. Of the 630 former patients of Dr. Owens who have been tested, none have tested positive for HIV.[3]

On March 21, 1991, patient Thomas S. Neuberger ("Neuberger") filed a proposed class action complaint in the Court of Chancery seeking injunctive relief and the impressment of a constructive trust on the assets of the Owens' estate and applicable professional liability insurance for the benefit of patients who might develop AIDS. The Court of Chancery ruled, however, that the claims alleged essentially sounded in tort and that an adequate remedy for damages existed at law. Thereafter, the 38 plaintiffs constituting the putative class in the Chancery Court action filed the underlying action in the Superior Court.

In their Superior Court action, the plaintiffs alleged that each of them had been patients of Dr. Owens in 1990 or 1991. Each claimed to have received treatment, including teeth extraction, reconstruction and cleaning, during which their gums bled. The plaintiffs alleged that Dr. Owens was HIV-positive and that he exhibited open lesions and memory loss at the time of such treatment. The plaintiffs did not allege the contraction of any physical ailment or injury as a result of their treatment, but claimed to have suffered "mental anguish" from past and future fear of contracting AIDS. They also alleged embarrassment in going for medical testing to a State clinic which they found to be "an uncomfortable environment." Plaintiffs sought compensation and punitive damages for mental anguish, the cost of medical testing and monitoring, and reimbursement for monies paid to Dr. Owens for dental treatment.

Plaintiffs' theory of recovery was cast in five counts: (i) negligence; (ii) recklessness; (iii) battery; (iv) fraudulent misrepresentation; and (v) false pretenses. The negligence and recklessness claims, in essence, alleged professional malpractice, while the battery count sought recovery for "unconsented" and "offensive touching." The fraudulent misrepresentation and false pretense claims both related to various representations and statements made by Dr. Owens to certain patients who, upon inquiry as to his condition, were provided with allegedly deceptive answers concerning his health.

After brief discovery, the Owens defendants[4] ("Owens") moved for summary judgment on two distinct grounds: (1) that plaintiffs' claims were barred since they were not asserted against the estate within the eight month period after the decedent's death as provided in 12 *Del.C.* § 2102(a); and (2) that all plaintiffs' claims, under whatever theory articulated, did not state a cognizable claim

HCW's fingers and a needle or other sharp instrument or object in a poorly visualized or highly confined anatomic site. Performance of exposure-prone procedures presents a recognized risk of percutaneous injury of the HCW, and—if such injury occurs—the HCW's blood is likely to contact the patient's body cavity, subcutaneous tissues, and/or mucous membranes. *Id.* at 4.

Federal law now conditions federal funding to the states upon their adoption and enforcement of the CDC guidelines. 42 U.S.C. § 300ee–2; Pub.L. 102–141, Title VI, § 633 (Oct. 28, 1991). OSHA regulations now also compel adherence to universal precautions. 29 C.F.R. § 1910.1030. Delaware has adopted standards analogous to the CDC guidelines. *See Guidelines for Preventing Transmission of HIV and Hepatitis B from Health Care Workers to Patients*, Delaware Division of Public Health, Department of Health and Social Service, *1–9 (Aug. 24, 1992).*

3. "Current scientific and medical literature establish, within a reasonable degree of scientific certainty, that a patient who has tested HIV-negative more than six months after a potential exposure will not contract the disease as a result of that exposure." *See* Silverman affidavit, *supra*, note 1. Although there is usually a lengthy latency period between infection of HIV and a manifestation of AIDS, in 95% of HIV-infected individuals, antibody tests will be seropositive for HIV within six months of the transmission of the virus. C. Robert Horsburgh, Jr., *et al., Duration of Human Immunodeficiency Virus Infection Before Detection of Antibody*, The Lancet 637–40 (Sept. 16, 1989).

4. In addition to Dr. Owens' estate, his professional liability carrier, St. Paul Insurance Company, was a defendant in the Superior Court and remains a named appellee in this Court.

for damages in the absence of a showing of physical injury. The Superior Court ruled that the complaint was not time-barred in view of the initiation of the Chancery action within the statutory period. That ruling has not been appealed. In reliance upon this Court's decision in *Mergenthaler v. Asbestos Corp. of Am.*, Del.Supr., 480 A.2d 647 (1984), however, the Superior Court ruled that plaintiffs had no basis for recovery for "fear of AIDS" in the absence of an underlying physical injury. Accordingly, the court dismissed all counts of the complaint. Plaintiffs have appealed only the Superior Court ruling with regard to the battery and misrepresentation claims.

## II

■ Our review of the Superior Court's grant of summary judgment is plenary. We consider *de novo* the factual record before the trial court and examine anew the legal conclusions to determine whether error occurred in applying pertinent legal standards. *Arnold v. Society for Savings Bancorp, Inc.*, Del.Supr., 650 A.2d 1270, 1278 (1994).

### A.

Preliminarily, we note that, in limiting their appeal to the Superior Court's rulings on the battery and misrepresentation claims, the plaintiffs have precluded from our concern the applicable standard of medical-dental care which our jurisprudence imparts. *See* 18 *Del.C.* § 6801(7). Thus, we do not address the extent, if any, Dr. Owens, as a Delaware health care provider, may have deviated from "the applicable standard of care in the specific circumstances of the case." 18 *Del.C.* § 6853. Our analysis of the treatment which plaintiffs received in a dental/patient relationship is narrowly confined to the common law standards that govern the intentional tort of battery and the mixed tort/contractual standards that define misrepresentation. We also note that, in their complaint and briefing, plaintiffs have failed to specify what form of battery was experienced by each individual plaintiff, except to the extent that all plaintiffs believed themselves subject to some form of unconsented, offensive touching. This is not a class action

and each individual plaintiff must prove specific harm. Nonetheless, in order to test the validity of the battery claims for summary judgment purposes we assume that each plaintiff alleges a subjective sense of offense. With respect to the claim for misrepresentation, to the extent it is viable, the claim would be limited to those patients, not specified by plaintiffs, who directly communicated with Dr. Owens concerning his condition.

### B.

Under the Restatement (Second) of Torts, "[a]n actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person ... and (b) a harmful contact with the person of the other directly or indirectly results." *Restatement (Second) of Torts* § 18 (1965); *see also* W. Page Keeton, *et. al.*, *Prosser and Keeton on Torts*, § 9 at 39 (5th ed. 1984) (hereafter "Prosser and Keeton") ("A harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff or third person to suffer such a contact, or apprehension that such contact is imminent, is a battery."). This Court has recognized that, under appropriate factual circumstances, a patient may have a cause of action against a medical practitioner for the tort of battery for acts arising from the practitioner's professional conduct. *See Newmark v. Williams*, Del.Supr., 588 A.2d 1108, 1115 (1991) (citing *Prosser and Keeton*, § 18 at 114).

■ In essence, the tort of battery is the intentional, unpermitted contact upon the person of another which is harmful or offensive. Lack of consent is thus an essential element of battery. *Prosser and Keeton*, §§ 9, 18. The intent necessary for battery is the intent to make contact with the person, not the intent to cause harm. *Id.*, § 8 at 36. In addition, the contact need not be harmful, it is sufficient if the contact offends the person's integrity. *Id.*, § 9 at 40. "Proof of the technical invasion of the integrity of the plaintiff's person by even an entirely harmless, yet offensive, contact entitles the plaintiff to vindication of the legal right by the award of nominal damages." *Id.* The fact

that a person does not discover the offensive nature of the contact until after the event does not, *ipso facto*, preclude recovery. *See Restatement (Second) of Torts* § 18 cmt. d (1965).

■ Although a battery may consist of any unauthorized touching of the person which causes offense or alarm, the test for whether a contact is "offensive" is not wholly subjective. The law does not permit recovery for the extremely sensitive who become offended at the slightest contact. Rather, for a bodily contact to be offensive, it must offend a *reasonable* sense of personal dignity. *Restatement (Second) of Torts* § 19 (1965).

> In order for a contact be offensive to a reasonable sense of personal dignity, it must be one which would offend the ordinary person and as such one not unduly sensitive as to his personal dignity. It must, therefore, be a contact which is unwarranted by the social usages prevalent at the time and place at which it is inflicted.

*Restatement (Second) of Torts* § 19 cmt. a (1965); *Prosser and Keeton,* § 9, at 42. The propriety of the contact is therefore assessed by an objective "reasonableness" standard.

■ Plaintiffs contend that the "touching" implicit in the dental procedures performed by Dr. Owens was offensive because he was HIV-positive. We must therefore determine whether the performance of dental procedures by an HIV-infected dentist, standing alone, may constitute offensive bodily contact

for purposes of battery, i.e., would such touching offend a *reasonable* sense of personal dignity?

As noted, HIV is transmitted primarily through direct blood-to-blood contact or by the exchange of bodily fluids with an infected individual. In a dental setting, the most probable means of transmission is through the exchange of bodily fluids between the dentist and patient by percutaneous (through the skin) contact, by way of an open wound, non-intact skin or mucous membrane, with infected blood or blood-contaminated bodily fluids. During invasive dental procedures,[5] such as teeth extraction, root canal and periodontal treatments, there is a risk that the dentist may suffer a percutaneous injury to the hands, such as a puncture wound caused by a sharp instrument or object during treatment, and expose the dentist and patient to an exchange of blood or other fluids. Robert S. Klein, *et al., Low Occupational Risk of Human Immunodeficiency Virus Infection Among Dental Professionals,* 318 NEW ENG. J.MED. 86 (1988). Although the use of gloves as a protective barrier during invasive dental procedures reduces the risk of exposure of HIV, their use cannot prevent piercing injuries to the hands caused by needles, sharp instruments or patient biting. *Transmission of Human Immunodeficiency Virus in a Dental Practice,* 116 ANNALS IN MED. 798, 803 (1992).

The risk of HIV transmission from a health care worker to a patient during an invasive medical procedure is very remote.[6]

---

5. Invasive procedure is defined as "surgical entry into tissues, cavities, or organs or repair of major traumatic injuries" associated with, *inter alia,* "the manipulation, cutting or removal of any oral or perioral tissues, including tooth structure, during which bleeding occurs or the potential for bleeding exists." Centers for Disease Control, *Recommendations for Prevention of HIV Transmission in Health Care Settings,* 36 MORBIDITY & MORTALITY WKLY. REP. 6S–7S (Supp. No. 2S 1987).

6. The CDC estimates that the probability of HIV transmission from a dentist to patient during a dental procedure in which the patient bleeds ranges from one in 263,158 and one in 2,631,-579. Centers for Disease Control, DRAFT: ESTIMATES OF THE RISK OF ENDEMIC TRANSMISSION OF HEPATITIS B VIRUS AND HUMAN IMMUNODEFICIENCY VIRUS TO PATIENTS BY THE PERCUTANEOUS ROUTE DURING INVASIVE

SURGICAL AND DENTAL PROCEDURES (Jan. 30, 1991); *see also* D.M. Bell, *et al., Risk of Hepatitis B and Human Immunodeficiency Virus Transmission to a Patient from an Infected Surgeon due to Percutaneous Injury During an Invasive Procedure,* 5 INFECT.AGENTS DIS. 263–69 (Oct. 1992) ("estimated probability of transmission from infected surgeon to a patient during single procedure is 0.00024—0.0024% for HIV"). The statistical estimate is derived from a three-fold probability:

> The likelihood of spreading HIV through medical procedures depends on this joint probability of an HIV-positive health care worker having a self-inflicted injury that exposes the patient's blood to the worker's blood, and having an exposure that leads to infection. CDC has estimated that there is between a .00038 percent (1 in 263,000) and .000038 percent (1 in 2,360,000) probability that an individual patient undergoing an invasive den-

In fact, even a person who is *exposed* to HIV holds a slim chance of infection. The CDC has estimated that the theoretical risk of HIV transmission from an HIV-infected health care worker to patient following actual percutaneous exposure to HIV-infected blood is, by any measure, less than one percent.[7]

Although this is the first "fear of AIDS" case in Delaware based on the intentional tort of battery, this Court, in a negligence setting, has addressed the issue of whether one can recover for mental distress in the absence of an underlying physical injury. In *Mergenthaler*, this Court held that:

> In any claim for mental anguish, whether it arises from witnessing the ailments of another or from the claimant's own apprehension, an essential element of the claim is that the claimant have a present physical injury.... Here, plaintiffs-spouses concede that they have suffered no physical injury due to wrongful asbestos exposure. Therefore, that concession is dispositive of this case

*Id.*, 480 A.2d at 651 (citations omitted).

 Here, plaintiffs have alleged no injuries which stem from their exposure to HIV. Instead, plaintiff's alleged "injuries" arise solely out of their *fear* that they have been

exposed to HIV. In essence, they claim mental anguish damages for their "fear of AIDS." As noted in *Mergenthaler*, however, damages for claims of emotional distress or mental anguish (which would include fear of contracting a disease) are recoverable only if the underlying physical injury is shown. *Id.*, 480 A.2d at 651. In this case, plaintiffs have sustained no physical injury, and, therefore, they could not recover under a negligence theory. *Id.* We recognize, however, that where an intentional tort is the basis for a claim of emotional distress an accompanying physical injury is not required "if such conduct is viewed as outrageous." *Cummings v. Pinder*, Del.Supr., 574 A.2d 843, 845 (1990).

As earlier noted, the offensive character of a contact in a battery case is assessed by a "reasonableness" standard. In a "fear of AIDS" case in which battery is alleged, therefore, we examine the overall reasonableness of the plaintiffs' fear in contracting the disease to determine whether the contact or touching was offensive. Since HIV causes AIDS, any assessment of the fear of contracting AIDS must, *ipso facto*, relate to the exposure to HIV. Moreover, because HIV is transmitted only through fluid-to-fluid contact or exposure, the reasonableness of a

---

tal procedure by an HIV-positive dentist will be infected with HIV. These odds are based on the assumptions that a dentist has a 0.4 percent chance of self-injury during a procedure, a 32 percent chance of contacting the patient's wound during this injury, and a chance of HIV infection after this exposure of between 0.03 percent and 0.3 percent. According to this risk-assessment model, the odds of a single dentist infecting five patients within 2 years would be infinitesimally small. General Accounting Office, *How Was HIV Transmitted to the Patients? The Dental Practice*, Report to the Chairman, Human Resources and Intergovernmental Committee, Relations Subcommittee, Committee on Government Operations, House of Representatives 46.

The only known instance of HIV transmission from a health care worker to a patient occurred in the well-publicized Kimberly Bergalis case in which a Florida dentist (Dr. Acer) infected as many as five of his patients. *Possible Transmission of Human Immunodeficiency Virus to a Patient During Invasive Dental Practices*, 39 MORBIDITY & MORTALITY WKLY. REP. 489, 489–93 (1990); Centers for Disease Control, *Update: Transmission of HIV Infection During an Invasive Dental Procedure—Florida*, 40 MORBIDITY & MORTALITY

WKLY. REP. 2, 21–26 (1991). To date, medical experts have been unable to scientifically determine how the dentist infected his patients. Based upon a CDC study, there has been no other confirmed case of HIV transmission from health care worker to patient from among 15,795 patients receiving treatment in settings where HIV-positive health care workers were present. Centers for Disease Control, *Update: Investigations of Patients Who Have Been Treated by HIV-Infected Health–Care Workers*, 41 MORBIDITY & MORTALITY WKLY. REP. 344–46 (1992). Despite the fact that over 10,000 health care workers reported having AIDS (including 285 dental workers), there have been no new documented transmissions since the CDC study. *Facts about HIV/AIDS and Health–Care Workers* CDC Fact Sheet (May, 1993).

7. Centers for Disease Control, *Recommendations for Preventing Transmission of Human Immunodeficiency Virus and Hepatitis B Virus to Patients During Exposure–Prone Invasive Procedures*, 40 MORBIDITY & MORTALITY WKLY. REP., RR–8, 3 (1991). Some have suggested that the actual instances of transmission are much lower than the percentages given by the CDC. *See* Marjorie H. Lawyer, *HIV and Dentistry*, 29 VAL.U.L.REV. 297 (1994).

plaintiff's fear of AIDS should be measured by whether or not there was a channel of infection or actual exposure of the plaintiff to the virus.[8]

It is unreasonable for a person to fear infection when that person has not been exposed to a disease. In the case of AIDS, actual exposure to HIV may escalate the threat of infection from a theoretical, remote risk to a real and grave possibility if the person exposed is motivated by speculation unrelated to the objective setting. Such fear is based on uninformed apprehension, not reality. In such circumstances, the fear of contracting AIDS is *per se* unreasonable without proof of actual exposure to HIV.[9] In our view, the mere fear of contracting AIDS, in the absence of actual exposure to HIV, is not sufficient to impose liability on a health care provider. AIDS phobia, standing alone, cannot form the basis for recovery of damages, even under a battery theory because the underlying causation/harm nexus is not medically supportable.

AIDS is a disease that spawns widespread public misperception based upon the dearth of knowledge concerning HIV transmission. Indeed, plaintiffs rely upon the degree of public misconception about AIDS to support their claim that their fear was reasonable. To accept this argument is to contribute to the phobia. Were we to recognize a claim for the fear of contracting AIDS based upon a mere allegation that one *may* have been exposed to HIV, totally unsupported by any medical evidence or factual proof, we would open a Pandora's Box of "AIDS-phobia" claims by individuals whose ignorance, unreasonable suspicion or general paranoia cause them apprehension over the slightest of contact with HIV-infected individuals or objects.[10] Such plaintiffs would recover for their fear of AIDS, no matter how irrational. *See* James C. Maroulis, *Can HIV–Negative Plaintiffs Recover Emotional Distress Damages for Their Fear of AIDS?*, 62 FORDHAM L.REV. 225, 261 (1993) ("Allowing juries to decide whether the plaintiff's fear is reasonable even where there is no evidence of exposure invites jury speculation and may allow recovery based on ignorance or unreasonable fear of the disease."). We believe the better approach is to assess the reasonableness of a plaintiff's fear of AIDS according to the plaintiff's *actual*—not *potential*—exposure to HIV.

In sum, we find that, without actual exposure to HIV, the risk of its transmission is so minute that any fear of contracting AIDS is *per se* unreasonable. We therefore hold, *as a matter of law*, that the incidental touching of a patient by an HIV-infected

---

**8.** Of the jurisdictions that have addressed the issue of recovery under any claim for the fear of AIDS, the great majority require proof of actual exposure to HIV for plaintiffs to recover damages for emotional distress caused by fear of contracting AIDS. *See, e.g., Barrett v. Danbury Hospital,* Supr., 232 Conn. 242, 654 A.2d 748 (1995); *K.A.C. v. Benson,* Minn.Supr., 527 N.W.2d 553 (1995); *Kerins v. Hartley,* 27 Cal. App.4th 1062, 33 Cal.Rptr.2d 172 (1994); *Doe v. Surgicare of Joliet, Inc.,* 268 Ill.App.3d 793, 205 Ill.Dec. 593, 643 N.E.2d 1200 (1994); *Lubowitz v. Albert Einstein Med. Ctr.,* 424 Pa.Super. 468, 623 A.2d 3 (1993); *Funeral Serv. By Gregory, Inc. v. Bluefield Comm. Hosp.,* Supr., 186 W.Va. 424, 413 S.E.2d 79 (1991), *overruled on other grounds, Courtney v. Courtney,* Supr., 190 W.Va. 126, 437 S.E.2d 436 (1993); *Ordway v. County of Suffolk,* N.Y.Supr., 154 Misc.2d 269, 583 N.Y.S.2d 1014 (1992); *Johnson v. West Virginia Univ. Hosp.,* Supr., 186 W.Va. 648, 413 S.E.2d 889 (1991); *Burk v. Sage Prod., Inc.,* E.D.Pa., 747 F.Supp. 285 (1990); *Doe v. Doe,* N.Y.Supr., 136 Misc.2d 1015, 519 N.Y.S.2d 595 (1987). Apparently, Maryland is the only jurisdiction in which the highest court permits recovery for a plaintiff who alleges potential exposure to HIV, yet does not show either a channel of exposure or a positive HIV test. *See Faya v. Almaraz,* Ct.App., 329 Md. 435, 620 A.2d 327 (1993).

**9.** In this holding, we recognize that the issue of reasonableness is ordinarily a question of fact for the trier of fact. *See generally Duphily v. Delaware Electric Cooperative, Inc.,* Del.Supr., 662 A.2d 821, 831 (1995). Nevertheless, this Court will decide an issue *as a matter of law* in those circumstances where only one conclusion can be reached from the application of the legal standard to the undisputed facts. *See Hercules Powder Co. v. DiSabatino,* Del.Supr., 188 A.2d 529, 535 (1963).

**10.** *See* Lauren J. Camillo, *Adding Fuel to the Fire: Realistic Fears or Unrealistic Damages in AIDS Phobia Suits?*, 35 S.TEX.L.J. 331 (1994) ("Permitting recovery of damages in tort for fear of disease based solely upon an unproven supposition that exposure to a disease-causing agent could have occurred, absent any facts showing that exposure did in fact occur, would run afoul of the most basic tenets of tort law.").

dentist while performing ordinary, consented-to dental procedures is insufficient to sustain a battery claim in the absence of a channel for HIV infection. In other words, such contact is "offensive" only if it results in actual exposure to the HIV virus. We therefore adopt an "actual exposure" test, which requires a plaintiff to show "actual exposure" to a disease-causing agent as a prerequisite to prevail on a claim based upon fear of contracting disease. Attenuated and speculative allegations of exposure to HIV do not give rise to a legally cognizable claim in Delaware.

█ In this action, plaintiffs have never alleged, either individually or collectively, *actual exposure* to HIV. Nonetheless, we must consider whether, from this record, there is any evidence of actual exposure to HIV from Dr. Owens as to any patient which would entitle plaintiffs' battery claims to survive a motion for summary judgment.

 A court may grant summary judgment when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Super.Ct.Civ.R. 56(c). In deciding whether there is a disputed issue for trial, the court must view the evidence in the light most favorable to the non-moving party. *Moore v. Sizemore*, Del.Supr., 405 A.2d 679, 680 (1970). When the moving party sustains the initial burden of showing the nonexistence of any material issues of fact, the burden shifts to the non-moving party to substantiate its adverse claim by showing that there are material issues of fact in dispute. *Id.* It is not enough for the opposing party merely to assert the existence of such a disputed issue of fact. The opponent to a motion for summary judgment "must do more than simply show that there is some metaphysical doubt as to material facts." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If the facts permit reasonable persons to draw from

them but one inference, the question is ripe for summary judgment. *Wootten v. Kiger*, Del.Supr., 226 A.2d 238 (1967).

In this case, the material facts are not in dispute. Even viewing the facts from plaintiffs' vantage point, the record fails to establish actual exposure to HIV. Plaintiffs argue to the contrary, noting that Dr. Owens exhibited lesions on his arms, legs, and elbow, and that he was known to have cut himself on at least one occasion while working on a patient. They have not, however, averred that the wound or lesions of Dr. Owens ever came into contact with the person of any of the plaintiffs, nor have they identified which patient was present during Dr. Owens' injury or even whether that patient was a plaintiff in this action. In fact, nothing in this record suggests any bleeding from Dr. Owens or that any wound or lesions ever came into contact with a break in the skin or mucous membrane of any of the plaintiffs. Plaintiffs have failed to demonstrate any evidence of actual exposure to potential HIV transmission beyond mere unsupported supposition.[11]

Plaintiffs also claim that Dr. Owens maintained a casual attitude toward infection control measures and did not adhere to universal precautions, thus posing a risk of infection to his patients. They note that Dr. Owens did not always wash his hands between patients and that he relied largely upon his assistants for infection control measures. In support of their claim, plaintiffs refer to an affidavit of Dr. William Shaffner, M.D., Professor of Medicine, Division of Infectious Diseases, Vanderbilt University School of Medicine. In that affidavit, Dr. Shaffner states that there is a potential for AIDS transmission if a dentist bleeds into a patient's mouth while performing invasive procedures, that the potential risk of AIDS transmission is higher if infection control procedures are casual, that a person can spread HIV through open herpes lesions, that a physician or dentist should not practice with lesions, especially on the hands, and that Dr. Owens created a greater risk of HIV transmission to his pa-

---

**11.** Contact permitting the passage of fluids is essential to any claim of battery in an AIDS setting. In this case, we read the complaint as lacking any such allegation. Our ruling today is not intended, however, to foreclose a claim of battery where it is alleged that a wound or lesion of an AIDS-infected health care provider came into actual contact with a break in the skin or mucous membrane of a patient.

tients than to those of Dr. Acer (Florida dentist who transmitted HIV to five patients).

In our view, the affidavit of Dr. Shaffner was insufficient to create an issue of material fact. The record reflects a finding that Dr. Owens' use of gloves during dental procedures was "consistent." It was also found that Dr. Owens was "better than average" in his employment of procedures for disinfection and sterilization. Even if it be assumed that the affidavit, taken at face value, suggests that Dr. Owens failed to comply with universal precautions, a factual inference of actual exposure is not warranted. Dr. Shaffner's affidavit does not recite that any plaintiff was "actually exposed" to HIV. Because actual exposure is necessary to support a claim based on a fear of contracting disease, the affidavit is insufficient to overcome summary judgment in this case.[12]

Although Dr. Owens presumably came into contact with the bodily fluids of some of the plaintiffs who bled during their dental procedures, there is no indication that the plaintiffs were actually exposed to a disease-causing agent. Again, HIV transmission requires fluid-to-fluid contact. In this case, plaintiffs have not been exposed to HIV, but rather, they have been exposed only to an HIV-infected dentist. Plaintiffs merely hypothesize as to how a possible exposure to HIV could have occurred without offering any substantiating evidence to that effect. Plaintiffs have shown nothing except that their risk of HIV infection was theoretical and remote. As such, plaintiffs' claims do not rise above mere speculation.

■■■ Of the several factual disputes from this record, none of the disputes relate to a *material* issue of fact. Although factual disputes are usually "not resolvable through summary judgment," immaterial factual disputes will not preclude summary judgment.

*State Farm Mut. Auto. Co. v. Mundorf,* Del. Supr., 659 A.2d 215, 217 (1995). Because plaintiffs have failed to show, individually or collectively, any exposure to the virus, the reasonableness of the plaintiffs' fear is not a material issue of fact. If any of the plaintiffs had contracted AIDS, or at least been exposed to HIV, their battery claim might prove successful, assuming that their consent to the procedures was vitiated. Absent such contraction or exposure, however, their claim of battery, like their claim of negligence, must fail.

### C.

■■■ Plaintiffs maintain that they can recover for battery, notwithstanding their lack of actual exposure to HIV, because they failed to give their informed consent to the dental procedures. It is argued that the tort of battery was committed upon the plaintiffs because they would not have consented to the dental procedures had they known that Dr. Owens was afflicted with AIDS. In support of their claim, plaintiffs seize upon the following language from *Newmark,* 588 A.2d at 1115, "[a] doctor commits the tort of battery if he or she performs an operation under normal circumstances without the informed consent of the patient." Plaintiffs argue that their consent to the dental procedures was vitiated by Dr. Owens' performing invasive dental procedures without disclosing his HIV status and the potential risk of infection of HIV to his patients.

■■■ Preliminarily, our ruling concerning the offensive contact element of battery in this case leaves any consideration of informed consent unnecessary. There appears to be some confusion, however, regarding the informed consent doctrine in its application to the torts of negligence and battery. In the malpractice context, informed consent is statutorily defined[13] and requires the patient

---

12. *Cf. Lynch v. Athey Prods. Corp.,* Del.Super., 505 A.2d 42 (1985) (holding that an affidavit containing conclusory allegations which, without a factual foundation, do not amount to more than speculation and conjecture and cannot be tested or countered by the opposing party, is inadequate to oppose a motion for summary judgment).

13. 18 *Del.C.* § 6801(6) provides:

(6) "Informed consent" means the consent of a patient to the performance of health care services by a health care provider given after the health care provider has informed the patient, to an extent reasonably comprehensible to general lay understanding, of the nature of the proposed procedure or treatment and of

to demonstrate the health care provider failed to supply information concerning the treatment or procedure "customarily given" by other "licensed health care providers with similar training and/or experience" in the community. 18 *Del.C.* § 6852(a)(2).

 In our view, the tort of battery is properly limited in the medical/dental setting to those circumstances in which a health care provider performs a procedure to which the patient has not consented. *See Cobbs v. Grant*, 8 Cal.3d 229, 104 Cal.Rptr. 505, 511–12, 502 P.2d 1, 8 (1972); *see also Kozup v. Georgetown University*, D.C.Cir., 851 F.2d 437 (1988) (remanding battery claim of parents whose child was given blood transfusions shortly after birth and contracted AIDS because parental consent for the transfusions was not obtained). In other words, "a battery consists of a touching of a substantially different nature and character than that which the patient consented." *K.A.C.*, 527 N.W.2d at 561. A physician may be held liable for battery when he or she obtains the consent of the patient to perform one procedure and the physician instead performs a substantially different procedure for which consent was not obtained. *Cobbs*, 104 Cal. Rptr. at 510–11, 502 P.2d at 7. A patient's consent is not vitiated, however, when the patient is touched in exactly the way he or she consented. *Id.* If a health care provider violates his or her duty of care in obtaining the consent of the patient by failing to disclose all relevant information (risks) that a reasonable person would deem significant in making a decision to have the procedure, the action should be pleaded in negligence—not battery. *Id.* at 511–12, 502 P.2d at 8; *cf. Oakes v. Gilday*, Del.Super., 351 A.2d 85, 87 (1976).[14]

the risks and alternatives to treatment or diagnosis which a reasonable patient would consider material to the decision whether or not to undergo the treatment or diagnosis.

14. Most courts addressing this issue have held that the cause of action in cases of inadequate disclosure is negligence. *See Oakes*, 351 A.2d at 87 (noting trend of cases away from battery and toward ordinary negligence); *Faya*, 620 A.2d at 334 n. 6 ("The cause of action for lack of informed consent is one in tort for negligence, as opposed to battery or assault."); *see also* Paul S.

In this case, plaintiffs do not allege that Dr. Owens performed different procedures from those to which they consented. Even after they learned of Dr. Owens' condition, the plaintiffs do not complain that he engaged in any dental procedure beyond that which they contemplated at the time of treatment. The plaintiffs are accordingly precluded from recovery in a battery action based upon lack of informed consent. Were we to authorize recovery for battery for this type of subjective, offensive touching, we would permit a common law civil tort to form the basis for recovery in an area which requires the application of medical standards and probabilities. We would thus substitute the most fragile sensibilities of the patient for the objective norms which govern the rendering of medical/dental care in the community.

### III

Plaintiffs also claim that the Superior Court erred in rejecting their claim for fraudulent misrepresentation. To prevail on a claim for fraudulent misrepresentation, a plaintiff:

(1) [m]ust make a false representation of a material fact to the victim. (2) The deceiver must have had knowledge of the falsity of his representation, while his victim must have been ignorant thereof. (3) The representation must have been made with the threefold intent that the victim believed it to be true, act in reliance thereon, and be deceived thereby. (4) The victim must have so believed, acted, and been deceived, as well as having been damaged thereby.

*Twin Coach Co. v. Chance Vought Aircraft, Inc.*, Del.Super., 163 A.2d 278, 284 (1960) (citations omitted).

Appelbaum, *et al., Informed Consent* 118 (1987); Gary Strausberg & Randal Getz, *Health Care Workers with AIDS: Duties, Rights, and Potential Tort Liability*, 21 U.Balt.L.Rev. 285 (1993) ("By analogy, the argument may be made that the transmission of the AIDS virus from doctor to patient during an operative procedure, when there was no adequate warning, may also be a battery.... [O]rdinary negligence [, however,] ... arguably is the more appropriate theory of liability.").

■ In this case, plaintiffs have offered evidence that Dr. Owens affirmatively misrepresented his state of health with respect to some of the plaintiffs, and that he did so intentionally while knowing of their reliance on his representation. In short, Dr. Owens allegedly lied to some of his patients when asked whether he had AIDS. If such allegations be accepted for summary judgment purposes the only remaining element of fraudulent misrepresentation at issue here is whether any plaintiff suffered compensable damages from his or her reliance upon the misrepresentations of Dr. Owens.

■ In general, a recovery for fraudulent misrepresentation is limited to economic damages, *i.e.*, those damages which are the direct and proximate result of the false representation consisting of the loss of bargain or actual out of pocket losses. *Harman v. Masoneilan Int'l Inc.*, Del.Supr., 442 A.2d 487, 499 (1982) (citing *Poole v. N.V. Deli Maatschappij*, Del.Supr., 224 A.2d 260 (1966)). A defendant who actively and fraudulently conceals or misrepresents information, however, is liable for the physical harm caused by the conduct. *Nicolet, Inc. v. Nutt*, Del.Supr., 525 A.2d 146, 149 (1987).

As noted earlier, plaintiffs have tested negative for HIV, and they have failed to show that they were exposed to HIV as a result of Dr. Owens' treatment. Thus, they have not suffered a legally cognizable and compensable physical injury from the representations of Dr. Owens, and they cannot recover for their mental anguish for fear of AIDS absent actual exposure to HIV. With respect to the plaintiffs' claim for reimbursement of the cost of their dental care, the fees paid to Dr. Owens were for services rendered and plaintiffs, apparently, received exactly what they bargained for in the way of dental services.

■ As for the expenses of HIV testing, the Division offered all of Dr. Owens' patients free HIV testing and counseling services. Thus, if plaintiff's expenditures for independent AIDS testing are viewed as "damages," the fact that those plaintiffs declined the option of free AIDS testing creates an issue of mitigation. A party has a general duty to mitigate damages if it is feasible to do so. *See American General v. Continental Airlines*, Del.Ch., 622 A.2d 1, 11 (1992); *Lynch v. Vickers Energy Corp.*, Del.Supr., 429 A.2d 497, 504 (1981). Certain plaintiffs have alleged embarrassment in going to a State clinic that was open to the general public for medical testing, and therefore chose instead to seek testing from their private physician. On this record, we cannot determine whether such a decision was warranted. A material issue of fact thus exists as to this issue which precludes the grant of summary judgment.

A remand is therefore necessary in this case since there are questions of fact as to (i) which plaintiffs received false representations from Dr. Owens[15] and, as to these plaintiffs, (ii) whether any such plaintiffs sought private AIDS testing and, if so, whether they were justified in declining the free AIDS testing in this case.

### IV

In conclusion, the tort of battery requires a harmful or offensive contact, and "offensive" conduct is tested by a reasonableness standard. We hold that the fear of contracting a disease without exposure to a disease-causing agent is *per se* unreasonable. Thus, absent actual exposure to HIV, plaintiffs cannot recover for fear of contracting AIDS. We further hold that those plaintiffs to whom Dr. Owens made a direct representation that he did not suffer from AIDS may recover for fraudulent misrepresentation, but any recovery is limited to economic damages.

The judgment of the Superior Court is AFFIRMED IN PART, REVERSED IN PART, and REMANDED for proceedings consistent with this opinion.

DUFFY, Justice (Retired), concurring in part and dissenting:

My views differ in several respects from those stated in the majority opinion and,

---

**15.** We do not suggest that a health care provider has an *affirmative* duty to respond to questions concerning his health, including his or her HIV status. In the interests of the provider's privacy, he or she may decline to answer without being subject to liability for false representation. But if a response is given to the patient, it must not be false.

respectfully, I dissent from much of its analysis and I agree with only one of its conclusions.

This is the first AIDS case of its kind to reach this Court and, unhappily, it involves the relationship between an infected health care provider—a dentist—and his patients. Obviously, that implicates serious and sensitive public policy (probably best determined in the legislative process) requiring a delicate balance between the dentist's need and opportunity to continue practicing his profession, and the right of patients (the public) to be protected from AIDS infection—which, as the majority states, is invariably fatal. It is this latter fact of life which gives this case both its pain and its special significance.

The litigation arrived here after the Superior Court had entered a summary judgment for defendant—on limited discovery and without trial on any issue.

The majority opinion makes little, if any, attempt to balance or analyze the respective interests of dentist and patient. Rather, its dispositive focus is on so-called "AIDS-phobia" claims which are based on fear of the virus and nothing more. But that is not this case—which is based on what the dentist did and did not do in his patient contacts. And although there were professional guidance and precautionary measures for health care workers to reduce the risk of HIV transmission, these were *advisory* only. Thus, in the last analysis, Dr. Owens was his own judge of what he should or should not do in his patient contacts. And the evidence certainly suggests that he acted in his own interest.

In this appeal, plaintiffs rely on two legal principles: the law as to battery and as to fraudulent misrepresentation.

As the majority states, a battery "is the intentional, unpermitted contact upon the person of another which is harmful or offensive." Lack of consent is essential and the contact must offend a reasonable sense of personal dignity. W. Page Keeton, et al., *Prosser and Keeton on Torts* § 9 (5th ed. 1984); *Restatement (Second) of Torts* § 18 (1965).

Relying entirely on national statistics of the most general kind, and with the benefit of hindsight, the majority concludes that any fear of contracting AIDS under the facts of this case is *per se* unreasonable—without "actual exposure" to the disease. Here there is much more than the "phobia" which the majority condemns as arising from ignorance, unreasonable suspicion, general paranoia or fragile sensibility. Indeed, there is an abundance of evidence from which a jury could conclude that the fears of plaintiffs—or some of them—that they may have contracted a fatal disease were reasonable. Consider the following, which is in the record:

● In March 1989, Dr. Owens knew that he was HIV positive; he continued to practice dentistry, including invasive procedures in which patients bled.

● His physical condition deteriorated in mid–1990.

● Thereafter he had open lesions on his face, arms, hands, legs, ankles and elbows; he scratched a lesion on his elbow, causing it to weep. He exhibited body weakness and memory loss.

● On at least one occasion he cut himself while working on a patient.

● In February 1991 Dr. Owens' own physician recommended that he discontinue practicing. He did not do so.

● Dr. Owens died on March 1, 1991 and promptly thereafter the Delaware Division of Public Health evaluated his practice and records.

● On March 13, 1991, Dr. Paul Silverman, the State Epidemiologist, filed a report, which states in part:

> Towards the end of 1990 [Dr. Owens'] illness seriously interfered with his clinical practice. We know this from several sources. Loss of memory, loss of motor skills, dementia. He cut himself at least once, and there are other accounts of problems which could pose a risk to patients. This became most serious during January and February. He did have lesions on his hand and elbow. Although he con-

sistently gloved, he did not wash between.[16]

Based on the facts known to Dr. Silverman and the Division, the State took prompt and aggressive action, including the following:

In March 1991, the Division prepared press statements about Dr. Owens, his disease and his patients. News stories about the case appeared in newspapers around the country and on local and Philadelphia television stations. The Division also mailed approximately 2,066 letters, certified, return-receipt requested, to patients of Dr. Owens who had been treated after January 1, 1980. The letter offered, at no charge, testing for the HIV antibody and both pre-test and post-test counseling services. A special telephone number was publicized for patients to call with questions and concerns. Trained counselors were reassigned from other duties to answer the telephone calls.

The concern of the Division was obvious—and reasonable.

I agree that defendant may do what was done here; that is, offer statistical data to show that patient contact by a dentist with AIDS results in transmission of the disease only in a very small percentage of cases and, for that reason (defendant argues), fear of AIDS from such a contact is not reasonable (and thus the contact is not "offensive" within the legal definition of "battery").

But I do not agree that the statistical data offered in this case is conclusive or dispositive "as a matter of law."

As the record evidence outlined above shows, plaintiffs have offered evidence to show that the contacts were offensive because the possibility of the transmission of AIDS (at the time of treatment) was greater than a statistical average because of: Dr. Owens' health, his open lesions and where they were, the stage or progression of his disease at the time of patient contact, the advice given by his own physician to stop treating patients, his casual attitude with respect to washing, and whether or not Dr. Owens complied with the advised precautions.

That evidence, coupled with Dr. William Shaffner's affidavit [17] and the actions taken by the Delaware Division of Public Health, in my opinion, create an issue of fact as to whether plaintiffs' fears were reasonable. And in the dictionary meaning of the majority's terminology, a jury could conclude that plaintiffs—or some of them—were exposed to AIDS; that is, they "lay open to . . . harm." *The Random House Dictionary*, p. 682 (2nd ed. 1987).[18]

Finally, as to the battery claim, the majority quotes with approval the standard law on that subject found in both the *Restatement (Second) of Torts* and in *Prosser and Keeton, supra:* an actor is liable if he intends to cause an "offensive contact with the person" of another. But the majority creates a special "offensive" requirement for this AIDS case, *viz:* the contact is not offensive as a matter of law unless it permits "the passage of fluids."

The majority has concluded also that, on the fraudulent representation issue, defendant is not entitled to a summary judgment.

---

**16.** Dr. Silverman's notes also include the following:

> Last few months of [Dr. Owens'] practice—open lesions on ... hands, ... elbow. Itched. Confusion, decreased appetite. Last 8 or 9 months Ron drove him places. Could not remember which tooth, what procedure. Cut himself. Burr got tangled in glove. Advised by [Dr.] Brafsman, family ... not to practice. Brafsman advised to inform [patients]. [ ... ] told us he hallucinated.

**17.** Dr. Schaffner's affidavit states in part:

> 4. If infection control procedures are casual, the potential risk of AIDS transmission is higher.
> 5. It is my understanding that Dr. Owens had lesions on his legs from herpes, which he

had shown to many of his patients. He also had similar lesions on his hands.

> 6. An individual can spread the AIDS virus through open herpes lesions. A physician or dentist should not practice if he has open lesions from herpes, particularly if they are located on the hands.
> 7. Due to Dr. Owens' lesions, it was reasonable to suggest that he stop treating patients.

**18.** It also seems to me that any consent given by a plaintiff patient to "contacts" was implicitly and reasonably based on an assumption that the dentist would take necessary precautions to avoid putting the patient to an unreasonable risk of infection from the AIDS virus.

I agree. That issue should simply be remanded for trial.

But the majority, with what seems to be an implicit purpose (whether or not intended) to deny plaintiffs or some of them any meaningful relief, adds a "standing" requirement and an "economic" measure of damages *plus* comments and rulings as to mitigation, fees paid to Dr. Owens and whether any plaintiffs "were justified in declining free AIDS testing."

In my view, advice as to these matters is inappropriate on the present record; issues concerning trial evidence on damages, in the first instance, should be decided by the trial judge.