# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

THE ESTATE OF THOMAS G.
STONE, JR.,

    Plaintiff,

  v.

BAYHEALTH MEDICAL
CENTER, INC.,

    Defendant.

:
:
:   C.A. No. K22C-03-017 JJC
:
:
:
:
:
:
:
:
:
:

Submitted: July 7, 2023
Decided:  October 24, 2023

## MEMORANDUM OPINION

Ronald G. Poliquin, Esquire, THE POLIQUIN FIRM LLC., Dover, Delaware, *Attorney for Plaintiff.*

James E. Drnec, Esquire, Phillip M. Casale, Esquire, WHARTON LEVIN EHRMENTRAUT & KLEIN, P.A., Wilmington, Delaware, *Attorney for Defendant, Bayhealth Medical Center, Inc.*

**Clark, R. J.**

Plaintiff, The Estate of Thomas G. Stone, Jr. (the "Estate") sues Bayhealth Medical Center, Inc. ("Bayhealth") for health care negligence that the Estate alleges caused Thomas Stone's death. Bayhealth denies liability and moves for summary judgment. It contends that the record contains no expert evidence to support a causal link between the Estate's alleged negligence and his death.

In discovery, the Estate identified one medical expert to support its claim. In a counsel-prepared Superior Court Civil Rule 26 disclosure, the Estate identified the physician who counsel represented would testify that Bayhealth breached the standard of care *and* that those breaches caused Mr. Stone's death. Bayhealth then deposed the Estate's expert near the conclusion of discovery. In the expert's deposition, he testified that he could not opine that Bayhealth's negligence *caused* Mr. Stone's death.

After discovery, Bayhealth contends in its motion that there is no opinion evidence that can support the Estate's burden to prove proximate cause at trial. The Estate counters with an affidavit from the same expert who testified in the deposition. In that affidavit, the expert recites that he was confused when he testified. He now provides a different opinion regarding causation – that is, that Bayhealth's alleged negligence proximately caused Mr. Stone's death.

For the reasons discussed below, the expert's affidavit is not part of the summary judgment record because the sham affidavit doctrine makes it inappropriate to consider it. Since the affidavit is unavailable, the record contains no opinion evidence to support an inference that Bayhealth's negligence caused Mr. Stone's death. Accordingly, summary judgment is appropriate.

## I.    Procedural and Factual Background

The facts recited below are those of record viewed in the light most favorable to the Estate, as the non-moving party. Mr. Stone sought and received medical

2

treatment at Bayhealth Medical Center in Dover, on December 28, 2019, at approximately 11:39 A.M.[1] At the time of his emergency room admission, he had two swollen legs with redness around an open wound to his right leg.[2] Emergency room personnel also recognized that Mr. Stone suffered from heart failure.[3] At the time of his admission, his symptoms from that condition had greatly increased.[4]

Later that night, at approximately 10:00 P.M., Mr. Stone's medical condition deteriorated significantly.[5] He became unresponsive and showed signs of acute hypoxic and hypercarbic respiratory failure.[6] The staff managed his liquids through IVs and administered various medications to stabilize him.[7] Nevertheless, Mr. Stone's condition continued to deteriorate.[8]

By 3:44 A.M. that morning, Mr. Stone had low blood pressure and a low respiratory rate.[9] The staff then transferred him to intensive care.[10] There, he tested positive for Pseudomonas, a bacterial infection, and "severe gram-negative shock," which is commonly known as sepsis.[11] The staff attempted various measures, but Mr. Stone did not respond.[12] Mr. Stone's family then requested that the hospital provide him comfort measures only and he passed away later that day.[13]

Following Mr. Stone's death, the Estate filed a healthcare medical negligence suit against Bayhealth for the alleged negligence of its staff.[14] Specifically, the

---

[1] D.I. 24 at 3.
[2] D.I. 24 ¶ 3–4.
[3] *Id*. at ¶ 7.
[4] *Id*.
[5] *Id*. at ¶ 11.
[6] *Id*. at ¶ 12.
[7] *Id*. at ¶ 13, 15.
[8] *Id*. at ¶ 15.
[9] *Id*. at ¶16.
[10] *Id*. at ¶ 17.
[11] *Id*. at ¶ 19.
[12] *Id*.at ¶ 20.
[13] *Id*. at ¶ 21.
[14] D.I. 1.

Estate alleges that Bayhealth breached the standard of care in two ways which proximately caused Mr. Stone's death.[15] First, the Estate contends that Bayhealth's staff did not appropriately control Mr. Stone's blood sugar, which in turn left him hypoglycemic, which in turn caused his death.[16] Second, the Estate contends that Bayhealth's staff did not treat Mr. Stone appropriately with antibiotics, which in turn left him septic, and in turn, caused his death.[17]

The Estate identified one medical expert in discovery, Dr. Aaron Gottesman, a board-certified internist.[18] The Estate never produced an expert report from Dr. Gottesman, however. Rather, counsel for the Estate prepared an expert disclosure outlining the doctor's expected opinions and the expected bases for those opinions.[19] In the disclosure, counsel wrote that Dr. Gottesman would opine as follows: (1) Bayhealth staff breached the standard of care by improperly diagnosing and addressing Mr. Stone's hypoglycemia and by failing to treat his sepsis properly with antibiotics;[20] and (2) Bayhealth's failure to properly treat Mr. Stone's hypoglycemia was a proximate cause of his death.[21] Later, counsel for the Estate provided an emailed update to Bayhealth disclosing that counsel expected Dr. Gottesman to also opine that Bayhealth's failure to appropriately treat his sepsis was a proximate cause of his death.[22]

At the end of discovery, Bayhealth deposed Dr. Gottesman.[23] In the deposition, the doctor confirmed that he did not draft the Estate's expert disclosure

---

[15] D.I. 24 ¶ 33–34.
[16] *Id.* at ¶ 34.
[17] *Id.* at ¶ 32–33.
[18] *Id.*
[19] *Id.*
[20] *Id.* ¶ 32–33.
[21] *Id.* ¶ 34.
[22] D. I. 30, Ex. B.
[23] D. I. 30, Ex. C (hereafter "Dr. Gottesman's Dep.").

– he believed that counsel had done so but was not certain.[24]  Dr. Gottesman also testified that Bayhealth breached the standard of care in two respects: (1) its staff improperly diagnosed and treated Mr. Stone's hypoglycemia;[25] and (2)  its staff improperly administered antibiotics to prevent and later treat his septic shock.[26] Completely absent from Dr. Gottesman's testimony, however, was an opinion regarding whether Bayhealth's negligence caused Mr. Stone any harm.  In fact, Dr. Gottesman emphasized throughout his testimony that he could not offer such an opinion to any level of certainty.[27]

As explained below, the Court must examine the question-and-answer exchange at the deposition carefully when applying the sham affidavit doctrine.  For that reason, the Court recites portions of Dr. Gottesman's testimony in some detail. First, Bayhealth's counsel and the doctor had a relevant question-and-answer exchange regarding hypoglycemia, which included the following:

> Counsel: Is it your testimony more likely than not that hypoglycemia caused or contributed to Mr. Stone's septic shock?

> Dr. Gottesman: My opinion is that the hypoglycemia was a contributing factor.  I wouldn't say caused but it was a contributing factor.[28]

Separately, Bayhealth's counsel asked Dr. Gottesman about his causation opinions regarding Mr. Stone's septic shock and hypoglycemia.  That exchange included the following:

> Counsel: Is it your testimony more likely than not that had Mr. Stone received antibiotic coverage consistent with what you believe is required, that more likely than not he would have survived this hospitalization?

---

[24] Id. at 19.
[25] *Id.* at 29.
[26] *Id.* at 29–30.
[27] *E.g.*, *id.* at 30–32.
[28] *Id.* at 30.

Dr. Gottesman: I cannot say had he received appropriate antibiotics and not had a two-hour delay that the outcome ultimately would have been any different. I cannot say that with certainty.

.  .  .

Counsel: I am a little confused how you can offer an opinion more likely than not that antibiotic mismanagement, I'll call it, was a proximate cause of Mr. Stone's death, yet you can't say if he had been properly treated he would have survived?

.  .  .

Dr. Gottesman: I cannot say that even had the standard of care been met that the outcome would have ultimately been different. **There is no way I could predict prospectively what the ultimate outcome would have been.**

Counsel: Right. And the way I understand what you're telling me is you believe more likely than not there was a breach in the standard of care related to the antibiotic management; is that fair?

Dr. Gottesman: That is a fair statement, yes.

**Counsel: But you cannot say more likely than not whether that caused Mr. Stones death?**

**Dr. Gottesman: That is also true**.

Counsel: Is that the same for the hypoglycemia, do you believe that hypoglycemia more likely than not contributed to septic shock; is that fair?

Dr. Gottesman: Fair.

Counsel: But you also cannot say more likely than not that had hypoglycemia been treated in the manner in which you say it should be that it would have prevented his death?

Dr. Gottesman: That's true.

**Counsel: So essentially you have standard of care opinions, but you do not have causation opinions more likely than not?**

**Dr. Gottesman: That's true**.[29]

---

[29] *Id.* 30 -33 (emphasis added).

Later, Dr. Gottesman's testimony confirmed his inability to conclude that Bayhealth's alleged mismanagement of antibiotics caused Mr. Stone's death. He again testified:

> Counsel: We've already covered today that you cannot say more likely than not that hypoglycemia or septic shock was the cause of his death; is that fair?
>
> Dr. Gottesman: Septic shock was the cause of his ultimate death.
>
> Counsel: But the mismanagement of antibiotics was not the … proximate cause of his death?
>
> Dr. Gottesman: That would be more accurate.[30]

After these exchanges, counsel for the Estate made no effort to rehabilitate Dr. Gottesman. The record then closed which fixed the testimony of the Estate's only expert.

After Dr. Gottesman's deposition and the close of discovery, Bayhealth moved for summary judgment.[31] Bayhealth's motion attacks the Estate's failure to secure expert evidence to support a necessary element of its claim: causation. The Estate opposes the motion with an affidavit signed by Dr. Gottesman.[32] In the affidavit, Dr. Gottesman recants his deposition testimony and opines to a reasonable degree of medical certainty that Bayhealth's negligence caused Mr. Stone's death.[33] The affidavit further recites that Dr. Gottesman became confused during the deposition regarding the proper standard.[34] To that end, he contends that he did not know that a causation opinion required only a greater than fifty-percent chance that Bayhealth's negligence caused Mr. Stone's death.[35] His affidavit fails to mention,

---

[30] *Id.* at 57–58.
[31] D. I. 30.
[32] D.I. 34, Ex. A (hereinafter "Dr. Gottesman's Aff.").
[33] *Id.* at ¶ 2.
[34] *Id.* at ¶ 3.
[35] *Id.*

however, why he held his mistaken belief. Nor does the affidavit provide the bases for his current opinion.

Thereafter, the Court held an oral argument on the motion. The argument focused on the recently filed affidavit and on whether the Court should apply the sham affidavit doctrine. Up to that point, the parties had not addressed the elements required to apply the doctrine. Accordingly, the Court requested supplemental briefing to address (1) whether the sham affidavit doctrine applies; and (2) if it does, what other evidence of record is available, if any, that could meet the Estate's burden of demonstrating an issue of fact.

## II. The Parties' Arguments

In Bayhealth's motion, it contends that the record contains no evidence to generate an issue of fact regarding proximate cause.[36] Bayhealth emphasizes that Dr. Gottesman, as the Estate's only expert witness, testified in his deposition that he could not say more likely than not that Bayhealth's negligence *caused* Mr. Stone's death.[37] As a result, Bayhealth asks the Court to apply the sham affidavit doctrine and either strike Dr. Gottesman's affidavit or ignore it.[38]

The Estate counters that summary judgment is inappropriate because its Rule 26 disclosure placed Bayhealth on notice that Dr. Gottesman would offer an opinion on proximate cause.[39] The Estate further contends that Dr. Gottesman became confused at the deposition regarding the legal definition of cause.[40] Furthermore, the Estate contends that the sham affidavit doctrine does not apply because the affidavit does not contradict Dr. Gottesman's prior testimony.[41] More precisely, the

---

[36] D.I. 30 ¶ 7.
[37] *Id.*
[38] D.I. 46 at 3.
[39] D.I. 47 at 3.
[40] D.I. 34 ¶ 7.
[41] D.I. 47 at 2–3.

8

Estate asserts that Dr. Gottesman's affidavit merely supplements "his previously anticipated testimony."[42]  Finally, the Estate argues separately that Dr. Gottesman's affidavit did not contradict his deposition testimony because he was unprepared to give any opinion regarding causation at his deposition.[43]  Under that theory, the Estate submits that Dr. Gottesman can interject his causation opinion into the record because he is only supplementing, rather than contradicting, his previous testimony.[44]

## III.  Standard of Review

Summary judgment is appropriate if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.[45]  When considering a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party.[46]  At the outset, the moving party bears the burden of persuasion.   If the movant meets this initial burden, the burden then shifts to the non-moving party to demonstrate a material issues of fact.[47]   At that point, the non-movant must identify a material fact in dispute that is sufficient to withstand a motion for judgment as a matter of law because it will support the verdict of a rational jury.[48]  To meet that burden, the non-movant must identify likely admissible evidence in the record that generates such an issue.[49]

---

[42] *Id*. at 2.
[43] *Id*. at 2–3.
[44] *Id.*
[45] *Brzoska v. Olsen*, 668 A.2d 1355, 1364 (Del. 1995).
[46] Super. Ct. Civ. R. 56(c); *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).
[47] *Sizemore*, 405 A.2d at 680.
[48] *Lum v. Anderson*, 2004 WL 772074, at *2 (Del. Super. Mar. 10, 2004).
[49] *See Phila. Indem. Ins. Co.  v. Bogel*, 269 A.3d 992, 1018 (Del. Super. Dec. 6, 2021) ("in summary judgment analysis, only likely admissible evidence at trial may be relied upon when demonstrating an issue of fact.").

## IV.   Analysis

Bayhealth contends that the Estate can identify no expert evidence to support a causal link between Bayhealth's negligence and Mr. Stone's death.   On this record, there are two items that could arguably meet the Estate's burden: (1) Dr. Gottesman's affidavit filed with the Estate's opposition to summary judgment;  and (2) the expert disclosure prepared by the Estate's counsel.   As explained below, the sham affidavit doctrine applies to Dr. Gottesman's affidavit;  for that reason, the Court will not consider it.   Furthermore, the Estate's counsel-prepared expert disclosure does not qualify as evidence that would likely be admissible at trial.   As a result, neither the late-filed affidavit nor the Estate's disclosure generate an issue of fact, independently, or in combination.

### A.  The sham affidavit doctrine applies to Dr. Gottesman's affidavit.

To sustain a claim for healthcare medical negligence, a plaintiff "must produce *expert medical testimony* that specifies (1) the applicable standard of care, (2) the alleged deviation from that standard, and (3) a causal link between the deviation and the alleged injury."[50]   Here, the result turns on whether the record contains expert evidence to support the Estate's burden regarding the third requirement – causation of harm.

As a threshold matter, Bayhealth meets its initial burden on summary judgment by relying on the deposition testimony of the Estate's only expert witness.[51]   Namely, Dr. Gottesman testified that he could not opine that the alleged

---

[50] *Green v. Weiner*, 766 A.2d 492, 495 (Del. 2001) (emphasis added); *see also* 18 *Del. C.* § 6853 (mandating by statute that "[n]o liability shall be based upon asserted negligence unless expert medical testimony is presented as to the alleged deviation from the applicable standard of care in the specific circumstances of the case and as to the causation of the alleged personal injury or death").

[51] *See Coleman v. Garrison,* 349 A.2d 8, 10 (Del. 1975) (explaining that in a motion for summary judgment, the defendant in a medical malpractice action met their initial burden by citing expert testimony that denied that the duty of care had been breached).

10

deviations caused Mr. Stone's death. By emphasizing that evidentiary shortfall, Bayhealth satisfies its initial burden on summary judgment. As a result, the burden shifts to the Estate to demonstrate a genuine issue of material fact.[52]

The pivotal issue in this case turns on whether the Court should accept Dr. Gottesman's affidavit. The affidavit includes the opinion that Bayhealth's negligence caused Mr. Stone's death to a level of certainty that exceeds fifty percent.[53] If the Court considers the affidavit, then summary judgment is inappropriate.[54] In the alternative, if the Court (1) considers the affidavit a sham and also (2) declines to consider the counsel-prepared expert disclosure, the Estate's claim fails because it can identify no issue of fact as to causation.

As an overview, the sham affidavit "doctrine" is less of a formal doctrine than a recognition of circumstances that, in fairness, require a summary judgment record to be fixed. In that regard, the sham affidavit doctrine is consistent with Delaware's law on summary judgment and the need for Delaware courts to regulate their trial deadlines. After the close of discovery, in response to a motion for summary judgment, a party should not be permitted to file an affidavit solely to "subvert a procedural device prescribed by the Court's rules of civil procedure . . .."[55] Summary judgment procedure would become pointless if a party were unable to rely upon a fixed record at some point in the process.

In one sense, the use of the term "sham" is unfortunate. A non-movant who attempts to broaden the record after the close of discovery does nothing fraudulent. Nevertheless, if he or she attempts to interject an affidavit into the record that

---

[52] *Id.*

[53] D.I. 34

[54] Bayhealth also contends the affidavit would not meet the Estate's burden even if the Court were to accept it because it provides no basis for his new opinion regarding proximate cause. The Court does not address that argument because, as discussed below, the sham affidavit doctrine makes it inappropriate for the Court to consider the affidavit in any respect.

[55] *In re Asbestos Litig.,* 2006 WL 3492370, at *4 (Del. Super. Sept. 11, 2006).

11

contradicts prior deposition testimony for the purposes of defeating an otherwise appropriate summary judgment motion, the party risks having the affidavit excluded from the record. For better or worse, the term sham has come to describe an affidavit that meets the requirements of the doctrine.

It is appropriate to recognize that the Delaware Supreme Court has not expressly adopted the sham affidavit doctrine. In *Cain v. Green Tweed*,[56] however, the Supreme Court applied the doctrine when examining why the Superior Court had applied it incorrectly.[57] Notably, in *Cain*, the Court recognized the mechanism's widespread use and that the federal courts and most state jurisdictions had fully adopted it by the time the Court issued that opinion in 2003.[58] Apart from that, the Superior Court has applied the doctrine in many instances both before and after the *Cain* decision.[59] As a result, the doctrine is firmly entrenched in Delaware jurisprudence.[60]

---

[56] 832 A.2d 737 (Del. 2003).

[57] *Id*. at 740.

[58] *Id.*

[59] *See e.g. Jacobi v. Pala Bros., Inc*., 1992 WL 52177 (Del. Super. Mar. 2, 1992); *Jefferson v. Helgason*, 2012 WL 1660889 (Del. Super. Feb. 13, 2012). *Shimko v. Honeywell Intern. Inc*., 2014 WL 4942189 (Del. Super. Sept. 30, 2014).

[60] Neither party raised an issue that the Court has nevertheless considered. Namely, the Delaware Supreme Court decision in *Drejka v. Hitchens*, 15 A.3d 1221 (Del. 2010), as refined by its decision in *Christian v. Counseling Resource Assoc., Inc.*, 60 A.3d 1083 (Del. 2013) provides six factors to analyze when determining if a matter should be dismissed for a failure of expert proof when a party has not complied with court-ordered discovery deadlines. At first blush, one might expect a tension between the factors set forth in those cases and the sham affidavit doctrine because both analyses consider the appropriateness of a final disposition based on lack of expert proof. The tension is relieved, however, by recognizing the narrow applicability of the sham affidavit doctrine. Here, there is no allegation that the Estate missed a discovery deadline or did anything inappropriate in discovery. Nor did Bayhealth fail to avail itself of available remedies to enforce such a deadline. Rather, Bayhealth took a timely discovery deposition. Discovery closed. Bayhealth then filed a timely summary judgment motion and the Estate's filing of an arguably contradictory affidavit triggers sham analysis. The application of the *Drejka* factors and the sham affidavit doctrine are appropriately reconciled because they address two separate issues: (1) violations of discovery deadlines that result in inadequate expert opinion evidence on one hand; and (2) the administration of summary disposition pursuant to Rule 56 on the other.

The doctrine has several elements that include the following: (1) there must be prior sworn deposition testimony; (2) the witness's answers must be given in response to unambiguous questions; (3) the witness must have provided clear answers to those questions; (4) the witness must later attempt to contradict his or her prior testimony in an affidavit; (5) the witness does not have an adequate explanation for changing his or her testimony; and (6) the proponent must submit the affidavit for the purposes of defeating an otherwise properly supported summary judgment motion.[61] The limiting nature of these elements makes the doctrine the exception rather than the rule and provides clear guidance for when an affidavit should be considered a sham.

When applying these elements in sequence, Dr. Gottesman submitted to a discovery deposition which meets the first element. The second and third elements are appropriately considered together because they focus on the two parts of the relevant testimonial exchange: the questions and answers provided in Dr. Gottsman's deposition. As to these two elements, the Court must consider the facts and circumstances surrounding the questioning and the responses, e.g., whether the record indicates that the witness was confused or an attorney needed to clarify the form of the question or answer through additional questioning.[62] Here, Bayhealth's counsel questioned Dr. Gottesman about his opinion regarding what caused Mr. Stone's death. In fact, counsel confronted the doctor in the plainest terms possible – by asking him whether, more likely than not, either deviation from the appropriate standard of care caused Mr. Stone's death.[63] His response was no regarding both alleged deviations.[64] Throughout the exchange, Dr. Gottesman exhibited no

---

[61] *In re Asbestos Litig.*, 2006 WL 3492370, at *5.
[62] *Id.* at *7; *Shimko*, 2014 WL 4942189, at *5.
[63] Dr. Gottesman's Dep. at 57.
[64] *Id*. at 57–58.

13

confusion.  Nor did the Estate's attorney take any measure to rehabilitate him later in the deposition.

Moving to the fourth element, the Court must compare Dr. Gottesman's testimony and affidavit to determine if the affidavit contradicted his prior sworn statements.[65]  When examining this element, courts distinguish between affidavits that contradict prior deposition testimony and those that merely explain or supplement it.[66]  If the recitation in the affidavit merely supports or explains a prior statement, then the doctrine does not apply.[67]  In that event, it would be inappropriate to ignore the affidavit for summary judgment purposes because doing so would usurp the trier of fact's role as the evaluator of witness credibility.[68]  Accordingly, a line must be drawn between (1) some inconsistency on the one hand, which leaves the matter for the jury to consider for credibility purposes, and (2) outright contradiction on the other, which crosses the line and makes it a sham.

Here, the Estate asserts that the affidavit is not a sham because Dr. Gottesman's affidavit merely supplements his deposition testimony.  In essence, the Estate argues that the doctor simply declined to offer a causation opinion when testifying.[69]  In that way, the Estate contends that the affidavit merely supplements his deposition testimony.[70]

The Estate's attempt to frame the affidavit as one providing only a supplemental opinion is incorrect for several reasons.  First, it identified Dr.

---

[65] *See Cain*, 832 A.2d at 741 (describing that the doctrine did not apply where the affidavit did not contradict the witness's first deposition but instead supplemented the testimony with additional information not elicited from opposing counsel).

[66] *Id.* at 740.

[67] *Cain*, 832 A.2d at 741; *Howell v. Kuster*, 2010 WL 877510, at *3–4 (Del. Super. Mar. 5, 2010).

[68] *See Yan Thou v. Motiva Enterprises, LLC*, 2009 WL 1515602, at *5 (Del. Super. May 29, 2009) (explaining that the trier of fact should resolve discrepancies of credibility and weight of evidence versus discrepancies that create shams).

[69] D.I. 47 at 2–3.

[70] *Id.*

14

Gottesman as its sole expert. In a counsel-prepared disclosure, the Estate disclosed that the doctor would offer opinions regarding breaches of the standard of care *and* how those breaches caused Mr. Stone's death.[71] Bayhealth's counsel confronted Dr. Gottesman with that disclosure during the deposition.[72] Despite having the disclosure in front of him when he testified,[73] he maintained that he could not say more likely than not that either alleged breach caused Mr. Stone's death.[74] Second, Dr. Gottesman went further than merely declining to answer questions regarding causation. To be precise, he testified that he could not say that Bayhealth's negligent treatment or diagnosis of hypoglycemia or sepsis, more likely than not, caused Mr. Stone's death.[75]

When making a rote comparison between his deposition testimony and the affidavit, the contradiction becomes even more clear. Namely, while the doctor testified that he could not say more likely than not that the deviations caused Mr. Stone's death, his affidavit provides, " I can attest to a reasonable degree of medical certainty that Bayhealth's failure to diagnose and treat Thomas Stone's septic shock more likely than not caused his death . . .."[76] Separately and with equal contradiction, the doctor recites in his affidavit that Bayhealth's breach of the standard of care caused Mr. Stone's death.[77] A plain reading of the deposition transcript and the affidavit demonstrates a direct contradiction.

---

[71] *Cf. CNH Industrial Am. LLC v. Am. Cas. Co. of Reading*, 2015 WL 1242650, at *2 (Del. Super. Mar. 10, 2015) (refusing to apply the doctrine where a party offered two witnesses to provide testimony on different issues and one was not contradicted because only one of the two could not provide an opinion on the issue); *Jefferson v. Helgason*, 2012 WL 1660889, at *3 (Del. Super. Feb. 13, 2012) (recognizing that a reaffirmation of opinion is not a contradiction).

[72] Dr. Gottesman's Dep. at 30.

[73] *Id*. at 10–11.

[74] *Id*. at 33.

[75] Dr. Gottesman's Dep. at 30–31.

[76] Dr. Gottesman's Aff. at ¶ 4.

[77] *Id.* ¶4.

The fifth element requires the Court to consider whether there is an adequate explanation for the contradiction.  If there is an adequate explanation, even if the Court finds that the witness's affidavit contradicts his or her prior statement, the Court may still consider the affidavit.[78]

Here, the Estate contends that Dr. Gottesman was confused by the questions and misunderstood the appropriate legal standard when testifying.  Namely, the doctor recites in his affidavit that:

> [t]he testimony at my deposition was caused by my confusion regarding the legal standard regarding causation, i.e. there is at least a greater than 50% chance that Bayhealth's failure to diagnose and treat Thomas Stone's septic shock caused his death while the failure to properly treat Stone's hypoglycemia was also a contributing factor to his death.[79]

Once again, if the doctor were to provide an explanation that could be accepted by a reasonable jury, the weight due the new opinion expressed in the affidavit would remain a jury issue relevant to witness credibility.  Here, however, Bayhealth's counsel reduced his questions to plain language that left no room for misunderstanding:

> Counsel: I am a little confused how you can offer an opinion more likely than not that antibiotic mismanagement, I'll call it, was a proximate cause of Mr. Stone's death, yet you can't say if he had been properly treated he would have survived?
>
> .  .  .
>
> Dr. Gottesman: I cannot say that even had the standard of care been met that the outcome would have ultimately been different.  There is no way I could predict prospectively what the ultimate outcome would have been.
>
> Counsel: Right.  And the way I understand what you're telling me is you believe more likely than not there was a breach in the standard of care related to the antibiotic management; is that fair?

---

[78] *Yan Thou*, 2009 WL 1515602, at *6.

[79] Dr. Gottesman's Aff. at ¶ 3.

Dr. Gottesman: That is a fair statement, yes.

**Counsel: But you cannot say more likely than not whether that caused Mr. Stones death?**

**Dr. Gottesman: That is also true.**[80]

This question-and-answer exchange addressed the burden of preponderance of the evidence in the simplest of terms: "more likely than not." Dr. Gottesman's explanation that he did not understand that he must provide his opinion with "greater than 50%" certainty could not be accepted by any reasonable jury. No reasonable jury could find Dr. Gottesman's parsing of two ways to say the same thing to be reasonable: that is, providing his opinion to the standard of "more likely than not" (in the deposition) versus "greater than fifty percent chance" (in the affidavit). The doctor provides no reasonable explanation for contradicting himself.

Furthermore, Dr. Gottesman's significant experience in testifying in medical negligence cases undercuts the reasonableness of his alleged confusion. Specifically, he has provided deposition testimony in fourteen other medical negligence cases, trial testimony in four medical negligence trials, and testimony during two pretrial panel hearings.[81] From one of those cases, Bayhealth offers a 2019 report that he authored where he provided a causation opinion based upon the specific breach of care alleged in this case.[82] Namely, in that report, he opined that the providers' inappropriate treatment of the plaintiff's septic shock *caused* that plaintiff's death.[83] The doctor exhibited no confusion regarding the meaning of the term "cause" four years ago when authoring that report. It follows that he provides no reasonable basis for confusion in this case.

---

[80] Dr. Gottesman's Dep. at 31–32 (emphasis added).
[81] *Id*. at 49–50; D.I. 46, Ex. A.
[82] D.I. 46, Ex. B.
[83] *Id.*

For these reasons, the facts of record, when viewed in the light most favorable to the Estate, demonstrate that (1) Dr. Gottesman provided sworn deposition testimony; (2) Bayhealth's counsel asked Dr. Gottesman clear and unambiguous questions in that deposition; (3) Dr. Gottesman provided clear answers to those questions; (4) Dr. Gottesman's affidavit contradicts his deposition answers; and (5) the Estate has not offered an adequate explanation to justify the contradiction. Finally, for the reasons discussed below, (6) the Estate offers the affidavit solely for the purpose of defeating an otherwise appropriate summary judgment motion.[84]

### B.   Absent Dr. Gottesman's affidavit, the Estate identifies no admissible evidence of record to generate a factual issue regarding causation of harm.

Delaware law requires a plaintiff to provide an expert medical opinion to prove a causal link between an alleged deviation from the standard of care and a resulting injury.[85]   In discovery, the Estate produced no expert report; rather, it produced a counsel-prepared expert disclosure.   While Delaware Superior Court Civil Rule 26(b)(4) does not require expert reports, as does its Federal counterpart,[86] such a counsel-prepared disclosure does not alone meet a non-movant's burden when opposing a summary judgment motion.[87]   Namely, counsel's disclosure includes hearsay, upon hearsay, and is not a sworn declaration of anyone, much less

---

[84] *See* 11 *Moore's Federal Practice*, § 56.94[c] (Matthew Bender 3d ed.) (recognizing that the sham affidavit doctrine does not apply if there is independent corroborative evidence in the record).

[85] *Green*, 766 A.2d at 492.

[86] *Compare* Fed. R. Civ. P. 26 ("a party *must* disclose … the identity of any [expert] witness it may use at trial … [and] this disclosure must be accompanied by a written report – prepared and signed by the witness…") (emphasis added), *with* Super. Ct. Civ. R. 26 ("A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions … and a summary of the ground for each opinion.") (emphasis added).

[87] This memorandum opinion does not address the issue of whether an expert report that is penned and signed by the expert, but not sworn to or incorporated into an affidavit, would separately meet a party's burden on summary judgment.  Once again, here, the Estate provided no expert report.

the expert-declarant to whom the opinions contained in the disclosure are attributed. Here, the record confirms that Dr. Gottesman could not be certain who prepared the disclosure – he was only certain that it was not him.[88] Furthermore, the disclosure does not otherwise meet the requirements of Superior Court Civil Rule 56 because it does not rise to the level of evidence that likely will be admissible at trial.[89]

In recognizing the scope of the summary judgment record, Bayhealth's counsel took Dr. Gottesman's deposition. The answers in that deposition are appropriately considered when deciding this summary judgment motion. In contrast, the Estate identifies none of the following items that Rule 56 considers sufficient to oppose a summary judgment motion: deposition testimony, admissions by a party opponent contained in an interrogatory response, affidavits submitted in the normal course of responding to a summary judgment motion (as opposed to sham affidavits), or admissions of fact contained in the pleadings.[90]

Although the Estate's expert disclosure complied with the discovery requirements of Rule 26(b)(4), by itself, it is not evidence that will likely be admissible at trial. As a result, it may not be considered part of the summary judgment record. Since there is no opinion evidence on this record that meets the Estate's burden regarding proximate cause, Bayhealth demonstrates the sixth and final element necessary to apply the sham affidavit doctrine.

## V. Conclusion

For the reasons explained above, the Court grants Bayhealth's motion for summary judgment because the Estate does not demonstrate a genuine issue of

---

[88] Dr. Gottesman's Dep. at 19.
[89] *Phila. Indem. Ins.,* 269 A.3d at 1018.
[90] *See* Super. Ct. Civ. R. 56 (providing that "pleadings, depositions, answers to interrogatories, and admissions on file … [and] affidavits" can be considered when deciding a summary judgment motion).

material fact regarding causation.  Accordingly, Bayhealth's motion for summary judgment must be **GRANTED.**

**IT IS SO ORDERED.**

/s/ Jeffrey J Clark
Resident Judge