# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JONATON O. RODRIGUEZ, | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No.: N20C-01-201 FJJ |
| v. | ) | |
| | ) | |
| CPL. EWEN P. CAHALL, CPL. | ) | |
| ANDREW J. CASSIDY, SGT. DAVID | ) | |
| HAMRICK, and | ) | |
| CPL. EDWARD MADIGAN | ) | |
| | ) | |
| Defendants. | ) | |

Submitted: June 17, 2024
Decided: June 25, 2024

## OPINION FOLLOWING TRIAL
## JUDGMENT FOR THE DEFENDANTS

*Herbert W. Mondros, Esquire, and Jill Bennett Gaiski,* Rigrodsky Law, P.A., Wilmington, Delaware, *Attorneys for Plaintiff.*

*Nicolas D. Picollelli and Julia Meyers, Deputy Attorneys General,* Office of the Attorney General, Wilmington, Delaware, *Attorneys for Defendants.*

**Jones, J.**

1

Plaintiff Jonatan Rodriguez ("Plaintiff" or "Rodriguez"), an inmate at Sussex Correctional Institute ("SCI"), brings suit against four (4) SCI correctional officers (collectively, "Defendants") following a January 26, 2018 physical confrontation, which he alleges involved excessive force. The correctional officers who remain as Defendants at the close of trial are Retired Lieutenant Ewen Cahall ("Cahall"), Lieutenant Andrew Cassidy ("Cassidy"), Lieutenant Edward Madigan ("Madigan"), and Former Lieutenant David Hamrick ("Hamrick"). Several other officers named in the suit were dismissed at various times before the conclusion of the evidence. Underlying Plaintiff's claim is the February 1, 2017 Vaughn prison riot when Lieutenant Stephen Floyd ("Floyd") was murdered by inmates of the prison. Rodriguez was one of several inmates charged in connection with the murder of Floyd.

Plaintiff alleges assault and battery and civil conspiracy. Rodriguez maintains that the force used against him on January 26, 2018 was excessive and the Defendants engaged in a civil conspiracy to harm Rodriguez in retaliation for his involvement in the February 2017 Vaughn Riot. A bench trial was held the week of June 3, 2024. Summations occurred on June 17, 2024. This is the Court's decision following that bench trial.

2

## STATEMENT OF FACTS

Plaintiff testified at trial. Defense called eight (8) correctional officers which included each Defendant. Defense also called a use of force expert, Jodie Hunter ("Ms. Hunter"). Various documents were submitted as exhibits. A video recording of the events of January 26, 2018 was submitted as evidence. The video was played numerous times throughout the trial which depicted the key events relevant to the Plaintiff's assault and battery claims. Based on the evidence presented, the Court finds that the following facts have been proved by a preponderance of the evidence.

On February 1, 2017, a riot occurred at James T. Vaughn Correctional facility, which resulted in the death of a correctional officer, Lieutenant Stephen Floyd. The riot occurred in Building C of the facility. Several inmates were charged with murdering Floyd, including Rodriguez. A number of those inmates were transferred to SCI and placed in maximum security housing on Unit 4. Under the rules of this unit, only one inmate was permitted to be outside of his cell and roaming the tier at a time. Absent an emergency, if a correctional officer was on the housing unit with an inmate who was not in his cell, the inmate was to be cuffed. Given the pending charges against the inmates on this unit, the correctional officers had orders not to engage in any conduct with the inmates that could jeopardize the prosecution of the charges pending against them. Each of the

3

Defendants were aware of the Vaughn Riot, knew Floyd, and knew that the inmates on housing unit 4, including Rodriguez, were charged with crimes alleging that they were involved in the Vaughn Riot and Floyd's death.

Rodriguez was one of the inmates on this maximum security unit at SCI. Rodriguez, like the other inmates on the unit, was allowed an hour a day of recreational time outside of his cell. Rodriguez was the inmate responsible for cleaning the unit. As a result of these responsibilities, he was given an additional 30 minutes recreational time to do his cleaning work. According to Rodriguez, he was often permitted to exceed this allotted 90 minutes outside of his cell to take a shower when he completed cleaning the unit. The guards who were usually assigned to this unit were aware of this practice. From Mr. Rodriguez's perspective, it was this practice that led to the events of the night in question.

At approximately 9:55 p.m. on January 26, 2018, Rodriguez was about to enter the shower, located on the second floor of the tier, the same level on which Rodriguez's cell was located. The video footage shows Rodriguez removing his shirt, then putting his shirt back on, and going down to the first level of the tier to stand in front of glass windows. On the other side of these glass windows were correctional officers and the unit's "bubble."[1] For the next three minutes, Rodriguez can be seen talking to whoever is on the other side of the glass. The

---

[1] The "bubble" is a command center where correction officers who are observing the unit are located.

area on the other side of the glass is not visible in the video and no correctional officers are visible on the video until the guards enter the tier. There is no audio that goes with the video, but it is apparent as events transpire that Rodriguez is becoming more agitated.

There is no dispute that Defendant Cassidy was on the other side of the windows when Rodriguez first approached this area and that he and Rodriguez communicated with each other. Rodriguez questioned Cassidy and told him that it was usual procedure to allow Rodriguez to get a shower before locking in. Cassidy told Rodriguez that his time was up, that he could not get his shower, and Rodriguez had to lock in. Rodriguez asked Cassidy to get a lieutenant involved. Cassidy again ordered Rodriguez to lock in. The video clearly shows that Rodriguez becomes more agitated as he continues to verbally engage with Cassidy. During this conversation, the lights on the tier flicker two different times, once at 9:56:53 p.m. and again at 9:57:10 p.m., a signal that inmates are aware means that it is time to lock in. Cassidy again asked Rodriguez to lock in, met by Rodriguez's refusal.

At this point, Cahall calls SCI's Watch Commander. The Watch Commander was consulted, given the nature of the inmates' charges relating to the Vaughn Riot. A Code 6 means a failure to lock in. When a Code 6 is called the institution goes into lock down, signaling for all available correctional officers to

respond to the scene to assist with the situation resulting in the Code 6. The Watch Commander advised Cahall to call the Code 6.

Department of Corrections ("DOC") considers a failure to lock in as a serious offense. Under DOC Rules and Regulations, an inmate cannot refuse an order to lock in and is not permitted to demand that a lieutenant get involved in the situation. An inmate is permitted to file a grievance at a later date, but the policy is clear that he cannot refuse to lock in as that jeopardizes the security of the entire correctional facility.

The Code 6 was called, and Rodriguez's cell door was closed at 9:58:35 p.m. so that he could no longer return to his cell. This is done to prevent an inmate from having to ability to return to his cell to retrieve weapons. Once a Code 6 is called, force by the correctional officers is permitted to be used on the inmate refusing to lock in unless the inmate, on his own, puts himself into a position of surrender. Rodriguez never put himself in a position of surrender.

Various correctional officers responded to the area outside of the door leading into the tier. At this point Rodriguez is standing about 6 feet from the windows and the door where the officers will enter the tier. Through the windows Rodriguez can and did see the guards assembling outside of the tier.

At 9:59:48 p.m. correctional officers enter the tier. Cahall was the first officer through the door. He immediately pepper sprayed Rodriguez. As Cahall

is approaching Rodriguez, the Plaintiff assumes a boxer stance. Rodriguez takes a swing at Cahall and hits him in the forehead. Madigan is the second officer through the door and goes to the right of Cahall. As Madigan approaches Rodriguez, the Plaintiff takes a swing at Madigan and makes contact with Madigan's face, causing his glasses to fall to the floor and break. Other correctional officers enter the tier including Hamrick. The officers as a group get Rodriguez to the ground.

Rodriguez contends that the officers continued to punch and kick him while he was on the ground. He contends specifically that Madigan punched him. The officers testified that they were trying to get him under control to cuff his hands and shackle his legs. The video is not clear enough to determine what was happening on the ground except that the correctional officers were able to eventually secure Rodriguez in handcuffs and shackles and escort him out of the pod.

After Cahall shot the pepper spray he went to the ground with Rodriguez and tried to control his right arm to get it behind his back to cuff him. Rodriguez was actively resisting Cahall. While on the ground, Cahall was punched in the face. Cahall did not punch or kick the Plaintiff.

7

After being punched by Rodriguez, Madigan assisted in getting Rodriguez to the ground. Madigan struck the upper part of Rodriguez's body to get him under control. Rodriguez continued to resist until the officers got him under control.

Hamrick was in booking and receiving when he heard the Code 6. He responded to the scene. When he entered the tier, he assisted officers in getting Rodriguez to the ground. Rodriguez continued to resist once on the ground. Hamrick applied three knee strikes to the back of Rodriguez's upper thigh to get his hands free so he could cuff him. The knee strikes were applied because Rodriguez refused to give up his hands to be handcuffed. Once Rodriguez was under control, Hamrick assisted in applying the leg shackles.

DOC's Policy 8.30 is the use of force policy. All correctional officers are trained in the use of force policy. Specifically, all the correctional officers who testified in this case were trained in the use of force policy. The use of force policy provides in relevant part:

> The use of force must be reasonable under the circumstances and should be used only when no other reasonable alternative is available. If possible, staff shall take reasonable steps to deescalate a situation or otherwise prevent the need to use force. The use of force may not be used as a retaliatory or disciplinary measure.

Rodriguez testified that Defendants Cassidy and Cahall had previously verbally threatened him, saying at different times that the state was going to kill him because of his actions in the Vaughn riot. No such allegations were made against

8

Madigan or Hamrick. All of the named Defendants and the remaining correctional officers denied ever threatening or coercing Rodriguez in any way. Each denied that they were seeking to retaliate against the Plaintiff based on his involvement in the Vaughn Riot. Each denied being involved in a conspiracy against Rodriguez. Rodriguez testified that on the night in question, Cahall said to Cassidy just before the correctional officers entered the tier "to open the door so we can kick his fucking ass." Cahall and Cassidy denied that this was said.

## ANALYSIS

Plaintiff's first two counts sound in assault and battery. A *prima facie* assault case requires a general showing that a Defendant's conduct placed the Plaintiff in apprehension of imminent harmful or offensive physical contact.[2] For battery, a Plaintiff must establish the Defendant intentionally caused harmful or offensive contact to the Plaintiff.[3] To recover for battery, a Plaintiff must merely show the Defendant intended to make non-consensual contact with the Plaintiff. The Plaintiff need not prove the Defendant intended to actually cause harm.[4]

A defense to an assault and battery claim in the case of an inmate is whether the correctional officers were justified in their use of force and whether that force was reasonable. As state employees, in order for the Defendants to be liable to the

---

[2] *See Brzoska v. Olson*, 668 A.2d 1355, 1361 (Del. 1995). Delaware law considers "harmful or offensive" contact to be that which offends a reasonable sense of personal dignity. *Id.*
[3] *See Miller v. Dockham*, 723 A.2d 397 (Del. 1998).
[4] *See id.*

Plaintiff under any theory, including assault and battery, the Plaintiff must prove that the alleged tortious conduct (i) did not arise out of, and in connection with, the performance of official duties involving the exercise of discretion, (ii) was performed in bad faith; and (iii) was performed with gross or wanton negligence.[5]

Plaintiff has presented no evidence as to the first element, so liability cannot be based on the exercise of discretion element. Plaintiff has presented evidence and argument that the Defendants acted in bad faith and their actions amounted to gross or wanton conduct. The crux of this argument is that the Defendants used excessive force in response to the situation, did not follow DOC policy 8.30 in trying to take steps to deescalate the situation, and took these actions because of Rodriguez's alleged involvement in the Vaughn Riot.

I find as a factual matter that the guards did not use excessive force and that their conduct was done in good faith and without gross or wanton conduct. Defendants called Jodie Hunter as a use of force expert. Hunter, a career DOC employee, described in detail DOC's Use of Force Policy and the integrated Use of Force Model. Hunter opined that, given the facts, Rodriguez, at the time the guards entered the tier, was a resister and as soon as he threw the first punch he became an assailant according to the Use of Force Model. Given this conclusion, with which I agree, the guards were justified in spraying the Defendant with pepper

---

[5] 10 Del. C. § 4001.

spray, under the guidelines of the Use of Force policy. When Rodriguez was taken to the ground (which was also justified and within the guidelines of the policy), Rodriguez continued to resist which made him a resister at a minimum and more likely an assailant. Madigan, Cahall, and Hamrick's actions to try to get Rodriguez under control, including but not limited to, Hamrick's three knee strikes to Rodriguez's upper thigh were well within the Use of Force policy given the circumstances. Their actions in getting Rodriguez under control were done in good faith and did not rise to the level of gross or wanton negligence.

Rodriguez maintains that the guards should have attempted alternative methods to bring Rodriguez under control per Department of Corrections policy 8.30. According to Plaintiff there were three alternatives. First, the guards should have allowed Rodriquez to take a shower. Second, a lieutenant should have been called. Third, Rodriguez should have been given the chance to cuff up.

First, with respect to the request for a shower there was testimony that had the guards agreed to this request, they would have been put in the future position of having to acquiesce to similar requests. This could have created chaos in the prison. I agree with this analysis.

With respect to calling a lieutenant, the undisputed testimony is that before the Code 6 was called, the Watch Commander, the most senior person on duty, was notified. The Watch Commander ordered that the Code 6 should be called.

11

The individual Defendants cannot be blamed for the order of the Watch Commander to proceed with the Code 6, especially after the number of attempts Rodriquez was given to look in.

With respect to cuffing up, Hunter opined that given Rodriguez's actions, a cuff up attempt would have been fruitless. I agree with Hunter.[6] Rodriguez created this situation because he did not lock in after being given at least 3 verbal warnings and two flick of the lights, which was understood to mean lock in. Rodriguez saw the correctional officers gathering on the other side of the door and instead of making an attempt to surrender started throwing his fists at the first two officers to reach him. On these facts, I agree that a warning to cuff up would have gone unheeded by Rodriguez and would not have resulted in a de-escalation of the situation.

I find that the Defendants' actions were done in good faith, without gross or wanton negligence, were within their discretion, and done within the parameters of the Use of Force policy. In short, the Defendants used reasonable force on a Plaintiff who ignored their numerous orders to lock in and became an active aggressor when confronted by the guards.

---

[6] Hunter's explanation of the use of force policy and its application to the present facts was credible. The same cannot be said for other portions of her testimony. The credibility issues on other portions of her testimony did not rise to a level that caused me to disagree with her conclusions on the appropriate use of force in this case given the facts as I have found them.

Plaintiff has also alleged a civil conspiracy amongst the Defendants. Delaware law requires a Plaintiff alleging civil conspiracy to show: (i) a confederation or combination of two or more persons; (ii) an unlawful act done in furtherance of the conspiracy; and (iii) actual damage.[7] Proof of malice, (*i.e.*, an intent to injure) is essential in proof of conspiracy.[8]

I find that the Plaintiff has not proven that an unlawful act was done in furtherance of the conspiracy as I find that the force used was appropriate under the circumstances. Moreover, there is a factual dispute about whether correctional officers threatened Rodriguez.[9] I reject the argument that the testimony of the guards was contrived or manufactured by the defendants as a reason to justify their actions. I find the testimony of the correctional officers that no threats were made to be more credible than the testimony of Rodriguez for four reasons.

First, in the grievance filed by Rodriguez after this incident, there was no mention of any threats by any correctional officers. Second, when asked in his deposition in this case who threatened him, Rodriguez did not identify anyone. Third, the correctional officers were under strict orders not to engage with any bad behavior by Rodriguez and the Vaughn Riot inmates who were transferred to SCI, so as to not impact the prosecution against them. The officers clearly were aware

---

[7] *See Nicolet, Inc. v. Nutt*, 525 A.2d 146, 150 (Del. 1987).
[8] *See UbiquiTel, Inc. v. Sprint Corp.*, 2005 WL 3533697, at *8 (Del. Ch. Dec. 14, 2005).
[9] This factual dispute applies only to the claims against Cahall and Cassidy as there was no evidence presented by Plaintiff that either Madigan or Hamrick ever threatened the Plaintiff in any way.

13

of and followed this policy as evidenced by Cahall's call to the watch commander on the night in question to obtain further approval to call the Code 6. Fourth, I find the correctional officers more believable than Rodriguez. In light of this, I find that Rodriguez was not threatened or coerced by the correctional officers.[10]

For the above stated reasons, I find in favor of the Defendants and judgment is entered accordingly.

**IT IS SO ORDERED**.

_/s/ Francis J. Jones, Jr._
Francis J. Jones, Jr., Judge

cc:   File & Serve Xpress

---

[10] I find that Madigan's statement "we should not go in there" does not contradict this finding. It does not suggest an attempt to retaliate especially where there is no testimony by plaintiff that Madigan ever threatened or coerced him  It could just have easily meant that not enough officers had gathered at the door of the tier when the door was about to be opened.