# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MARVIN NEWTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. N24C-02-008 KMM |
| | ) | |
| LEPARC CONDOMINIUM | ) | |
| ASSOCIATION; PREMIER | ) | |
| COMMUNITY ASSOCIATION | ) | |
| MANAGEMENT, LLC; DANIEL P. | ) | |
| EDGAR, individually; and DANIEL P. | ) | |
| EDGAR, as Chairman of the | ) | |
| Condominium Association, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| LEPARC CONDOMINIUM | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Counterclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARVIN NEWTON | ) | |
| | ) | |
| Counterclaim Defendant. | ) | |

Submitted: February 12, 2026
Decided: April 7, 2026

## MEMORANDUM OPINION AND ORDER

*Defendants' Motion for Summary Judgment* – **GRANTED in Part, DENIED in Part**

Alex J. Smalls, Esq., Charles Toliver, IV, Esq., TEAMTICE, LLC, Wilmington, DE, *Attorneys for Plaintiff and Counterclaim Defendant Marvin Newton.*

Eileen M. Ford, Esq., Stephanie Emmanuel-DeLuna, Esq. MARKS, O'NEILL, O'BRIEN, DOHERTY & KELLY, P.C., Wilmington, DE, *Attorneys for Defendants LeParc Condominium Association, Premier Community Association Management, LLC, and Daniel P. Edgar.*

Robert J. Valihura, Jr. Esq., Caren L. Sydnor, Esq., MORTON, VALIHURA & ZERBATO, LLC, Greenville, DE, *Attorneys for Counterclaim Plaintiff LeParc Condominium Association*

**Miller, J.**

## I.     *Introduction*

Prior to purchasing units at LeParc Condominiums, Marvin Newton ("Newton") was well aware of the history of structural deficiencies in the buildings. After closing on the purchase of a unit in Building 5201, he made some changes to the unit, which are alleged to have caused further structural deficiencies. The New Castle County Department of Land Use (the "County") declared the units in Building 5201 UNSAFE and prohibited occupancy until repairs were completed.

Newton challenges actions allegedly taken by the LeParc Condominium Association (the "Association"), its property manager, Premier Community Association Management LLC ("Premier"), and the chair of the Association's governing body, Daniel Edger, claiming they damaged his unit, constructively evicted his tenants, improperly assessed fees against him, and denied him certain rights as a unit owner.

The Association asserts counterclaims against Newton seeking recovery of repair costs and fees incurred due to his allegedly improper alterations to the unit.

After discovery closed, defendants filed a Motion for Summary Judgment on Newton's claims (the "Motion").[1]  The Association's claims against Newton are not implicated by the Motion.

---

[1] Opening Brief ("OB"), D.I. 113.

1

Newton's claims against Edgar and Premier fail as a matter of law. Most of his claims against the Association fair no better. Newton fails to present evidence in support of his claims or they fail as a matter of law. The only claim that survives relates to the attorneys' fees assessed against him. The Association did not meet its burden to show it is entitled to judgment as a matter of law on this claim. Accordingly, the Motion is GRANTED in Part and DENIED in Part.

## II. *Factual Background*

### A. *LeParc Management*

LeParc Condominiums is a community development situated along the Delaware River in North Wilmington ("LeParc"). The LeParc Condominium Association (the "Association") is the governing body of the development. Daniel Edger, a unit owner, is chair of the Council of the Association, which is charged with management of the Association.

Premier is the managing agent for the property.[2] Pursuant to the Comprehensive Management Agreement, Premier is responsible for providing comprehensive financial management services, in compliance with the budget plan approved by the Council. Premier also provides administrative services, such as

---

[2] OB, Ex. G-1 at 0051-059.

2

preparing management reports, attending meetings, responding to service requests, and assisting the Council with its communications.[3]

**B.    *Structural problems plagued LeParc.***

In August 2017, the County was notified of deficiencies concerning decks on the three buildings at LeParc.  The property was inspected by a structural engineer and New Castle County's Building & Site Inspector, Michael Fox, which resulted in the issuance of an UNSAFE Notice to the Association.  After a hearing, the County issued its Decision ("2017 Decision") on August 29, 2017.[4]  The County considered the structural engineer report, which stated:

> Based on our observations from repair monitoring site inspections, we feel that most of the exterior decks in the rear side of all buildings are structurally deficient.  We are very concerned about imminent failure or sudden collapse of the exterior decks that may cause human injury.  Considering safety in mind, we recommend that all the rear exterior decks of all three (3) Le Parc Condominium buildings not be used or occupied by owners until these decks are either stabilized or repaired.[5]

The County found that the UNSAFE Notice was properly issued and directed installation of code-compliant safety barriers and that corrective actions be taken within the specified timeline.[6]

---

[3] *Id.*
[4] OB, Ex. A at 001.
[5] *Id.* at 002.
[6] *Id.* at 002-003.

3

The structural issues did not stop there. Long, Tann & D'Onofrio, structural engineers retained by the Association, conducted monthly inspections of the property. In its June 4, 2018 letter, the engineering firm reported that ongoing water infiltration along the buildings facing the Delaware River remained "a significant concern" and that "[a]long the rear elevation …, temporary shoring [was] provided along the interior at the diagonal windows of building 5201…. The shoring extends from the foundation vertically to the roof, and relieves vertical load on the exterior wall. Similar shoring is required at the remaining diagonal window locations along the rear elevation, or ten additional locations total."[7]

To address the instability at the east-facing diagonal wall in several buildings, including 5201, "shoring was installed on the interior face of the exterior wall. The purpose of the shoring [was] to re-support the floor, thereby limiting vertical loads on the diagonal walls."[8] The shoring "went up through the building from the crawl space through the upper four (4) floors."[9]

### C.    *Newton purchases and rents Unit 5201-2.*

In February 2022, Newton purchased Unit-2 in Building 5201 ("Unit-2").[10] At the time, the support shoring installed in 2018 was visible and included 3 floor-to-

---

[7] OB, Ex. B1 at 026-027.
[8] *Id.* at 07.
[9] OB, Ex. B2 at 071.
[10] OB, Ex. I.

ceiling vertical wooden posts along the windows facing the river, attached to a horizontal wooden plate at the ceiling and another on the floor, as well as a nearby standalone vertical wooden post secured in a similar manner.[11]  Newton testified that he saw the posts before he purchased the unit.[12]

Newton was also aware of the deficiencies with Unit-2, as his realtor had been "very upfront" about the serious defective conditions, including the restriction on accessing the deck.  Specifically, Newton testified that his realtor "kept mentioning about how this place was falling down, how they have major construction problems out here, and asked me did I understand that, you know, you can't use the [decks]…he just says that the county says that the [decks] could not be used under no circumstances…."[13]  After being well informed by his realtor and his prior purchase of 3 other LeParc units (including Building 5201 unit 4 ("Unit-4"), which he rented to Ronette Anderson), Newton purchased Unit-2 for $45,000.[14]

Within days of closing on Unit-2, Newton installed four-by-four posts on both sides of the windows facing the river and boxed in the area (including the shoring

---

[11] OB, Ex. C-4 at 0257.

[12] October 3, 2025, Deposition Transcript of Marvin Newton, OB, Ex. D at 41-42 ("Newton Dep.") (acknowledging he saw the two-by-fours in Unit-2).

[13] *Id.* at 35–36, 44–45.

[14] *Id.* at 27, 37; OB, Ex. I.

posts installed in 2018) with drywall.[15]  The following month Newton rented Unit-2 to Aniyah Gullette ("Gullette"), who continues to reside in the unit.[16]

### D.  *Additional structural deficiencies found in Building 5201.*

After the 2017 Decision, LeParc was required to submit an annual engineering report to the County.[17]  To prepare the 2022 report, the Association retained Larsen & Landis, an engineering firm, to perform an inspection, which resulted in a November 14, 2022, Structural Engineering Report ("November Engineering Report").[18]  The report found a displacement of the exterior wall in Building 5201 along the diagonal wall, with the wall "bending outward."  The condition "steadily worsened over time and need[ed] to be addressed."[19]

The November Engineering Report recommended stabilizing the condition until permanent repairs were completed by removing

> the window, window header, window sill, jack studs, and the cripple studs … and replac[ing the studs] with a minimum of 2x4 studs spaced 16" maximum on centers, extending continuously from the wall sill plate to the double top plate. The exterior face of the studs shall be sheathed with ½" nominal APA rated wall sheathing with a span rating of 24/16 and fastened with 8d nails at 6" o.c. along panel edges and 12" o.c. along intermediate supports, with 2x4 blocking between studs, behind the unsupported edges. The exterior face of the sheathing and all joints

---

[15] Newton Dep. at 102-104 ("All I did is put the four-by-fours up to those there posts so I could put enough drywall around it so the wood would not be exposed."), 163.

[16] *Id.* at 67, 163-164, 204.

[17] *See* OB, Ex. A at 006, 009.

[18] *Id.* at 019-20.

[19] *Id.* at 019.

6

between the new wall and existing construction shall be waterproofed as required to prevent water infiltration.[20]

The report also requested that the Association "remind occupants that the balconies and porches are unsafe, shall not be accessed, and the barriers remain in place until permanent repairs [were] completed."[21]

LeParc retained Unlimited Construction Co., Inc. ("Unlimited Construction") to make the repairs recommended by the November Engineering Report. Unlimited Construction was in communications with Mr. Fox from the County regarding the permitting and timing.[22]

In preparation for the repairs, Unlimited Construction performed an exterior visual inspection of Building 5201 on December 13, 2022. Unlimited Construction reported to the Council that:

> the structural wall that was replaced by the owner in [Unit-2] appears to have not been done properly. [I]t appears the wall does not go past the drywall at the ceiling. There is a false ceiling in there so it is not supporting any weight. This wall needs to be repaired prior to us working on the building as it is a safety concern.[23]

With this condition, Larsen & Landis instructed Unlimited Construction to "add more reinforcements" to the impacted area.[24] Given the safety issues, Unlimited

---

[20] *Id.* at 020.
[21] *Id.*
[22] *Id.* at 023-027, 031-033.
[23] *Id.* at 034.
[24] *Id.* at 035.

Construction received permission from Gullette that same day to enter Unit-2 to make emergency repairs.[25]

In mid-December 2022, Unlimited Construction performed additional emergency repairs, which included removing the incorrect bracing, removing drywall from the ceiling, installing temporary bracing, removing carpet in the work area, taping-off area for dust control, and removing and replacing the handrail guard.[26] Unlimited Construction returned to Unit-2 a couple of days later to continue repairs as directed in the November Engineering Report, which included adding reinforced beam posts, removing the drywall around the windows, removing the improperly installed bracing, and installing four-by-fours from the footer up to the reinforced edge of wall.[27]

Newton was aware that repairs were underway when he arrived at Unit-2 on December 15, 2022, and spoke to Unlimited Construction's representative about the repairs and the condition of the Building.[28]

Larsen & Landis issued a follow up report on December 12, 2022 (the "Updated Report"), reflecting the conditions after Unlimited Construction's temporary repairs.[29] The Updated Report found that the prior

---

[25] Newton Dep. at 70, 74.
[26] OB, Ex. A at 036.
[27] *Id.* at 035, 134-174.
[28] Newton Dep. at 69 (Gullette advised Newton of the repairs); OB, Ex. H (Newton's recording of detailed discussion of the repair plan with Unlimited Construction).
[29] OB, Ex. A at 038-039.

framing was installed apparently in place of the [2018] temporary shoring.

[This] new framing was not properly positioned or sized, resulting in the floor loads being re-transferred to the diagonal exterior wall. As a result, the diagonal wall displaced outward significantly, resulting water infiltration through the exterior wall. This affected the full height of the wall extending from the first floor to the roof.[30]

Larsen & Landis recommended that, due to the instability of the diagonal exterior wall, the outside area adjacent to the wall be cordoned off to prevent access below the wall and that Building 5201 "be unoccupied during the demolition and reconstruction of the diagonal exterior wall."[31]

### E.     *Building 5201 is declared UNSAFE.*

Based on the safety issues and recommendations of the engineers, the Association sent letter to the owners of units in Building 5201 on December 22, 2022.[32] The letter advised unit owners:

> This is formal notice required under the governing documents of Le Parc Condominium and the Unit Property Act of the need to access your Unit and to require you and all occupants to vacate the Unit….
>
> The repair work must take place in each of the Units will take approximately 60 days.... **During this period, all residents of the four (4) units, including owner occupants and tenants, must find alternative housing**. Given the scope of the repairs, and the significant work to the structural elements of the building that must be undertaken, occupancy and/or use of the units during this repair project is unsafe, and, after discussing this matter with the engineer and the construction project supervisor, there is no safe repair process alternative that will allow any

---

[30] *Id.* at 039.
[31] *Id.*
[32] *Id.* at 053-054.

9

resident/occupant/tenant to remain in any one of the units during the pendency of this repair work.

*** 

If you are a landlord, **your tenants must vacate the unit during the pendency of this repair project**.

Please understand for safety reasons this repair project must take place immediately, and as soon as the appropriate permits are issued by New Castle County, the work will begin. It is currently expected, as of today's date, that work will begin shortly after the beginning of the new year. When the actual start date is known, you will be informed immediately.

**Again, this is an emergency situation** …, and the work must start immediately to ensure the long-term safety of the occupants of the building tower your unit is located in and the building structure itself. **If you have tenants, please make sure that you inform them immediately** and work with them consistent with your obligations under the Code. …[S]ubstitutional housing for no less than 60 days will be required and **that access to the Unit during that 60 days will be prohibited**.[33]

Newton acknowledges receipt of this letter.[34]

The Association sent a follow up notice to Newton on December 29, 2022, advising that the "emergency construction work" on Building 5201 would begin immediately following the new year and the units, including Unit-2 and Unit-4, needed to be vacated by January 3, 2023.[35]

---

[33] *Id.* (emphasis in original).
[34] Newton Dep. at 122–123.
[35] OB, Ex. A at 074.

After permits were obtained, the repair work began by January 4, 2023.[36]

Despite the prior notices, the Association learned on January 4, that some tenants had not vacated the units and did not intend to do so.  The Association reported the situation to Mr. Fox and asked the County for help.[37]

Thereafter, on January 9, 2023, the County issued and posted "UNSAFE" notices on the door to each unit in Building 5201, including Unit-2 and Unit-4.[38]  The notices stated

This Structure is

UNSAFE

and its Occupancy has been Prohibited by the Code Official

No Work, Repair, or Demolition may continue on this Structure until
all Permits have been obtained[39]

Newton knew his tenant in unit 5201-4 remained in the premises despite the notices.[40]

A Rule to Show Cause Hearing on the UNSAFE Notices was set for January 17, 2023, at which owners would have an opportunity to dispute the UNSAFE designation.[41]

---

[36] *Id.* at 051, 055-056, 062, 068.
[37] *Id.* at 065.
[38] *Id.* at 069-72, 075.
[39] *Id.*
[40] Newton Dep. at 128–130.
[41] OB, Ex. A at 075, 079.

The County issued its Rule to Show Cause Decision on January 18, 2023 (the "2023 Decision").[42] The hearing officer considered the findings of Larsen & Landis and Mr. Fox's testimony that the required building permits had been issued and the repairs had started.[43] The hearing officer found that the UNSAFE notices were issued correctly.[44] The 2023 Decision directed that "occupying any unit shall be prohibited until the 'UNSAFE' condition(s) have been corrected."[45]

Newton testified that at some point, the locks on his units were changed and his tenant in Unit-6 was unable to access her unit.[46] His tenant, Ms. Anderson, called the police on January 16, 2023, who facilitated her gaining access to the unit to retrieve her belongings.[47]

The repairs were ultimately completed by mid-March 2023.[48] Larsen & Landis issued a report on March 20, 2023, to the Association opining that the completed repairs complied with New Castle County's Building Code load requirements.[49]

## III. *Newton's Claims*

Newton's complaint alleges in Count I that Premier and Edgar directed a contractor to enter Unit-2 to make unauthorized changes, including removal of the

---

[42] *Id.* at 094-097.
[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] Newton Dep. at 53.
[47] *Id.* at 54; *see* OB, Ex. F at 0009.
[48] OB, Ex. A at 098-100.
[49] *Id.* at 101-02.

glass doors and patio. This, he contends, amounts to civil trespass and criminal mischief. He further claims that the defendants failed to obtain the necessary permits and the work was not in compliance with the code, thereby resulting in a loss in value to the unit.

In Count II, Newton claims that Edgar and Premier improperly charged attorneys' fees to his LeParc accounts, denied Newton access to meeting minutes, and illegally changed the locks on Newton's units, all in violation of 25 *Del. C.* Ch. 81.

In Count III, Newton claims that Edgar interfered with Newton's and his tenant's enjoyment of Unit-4 by changing the locks on the unit, which could only be accessed with the assistance of the County.

IV.     *The Parties' Contentions*

Defendants make two arguments on summary judgment. First, as chair of the Council, any decisions Edgar allegedly made are protected by the Volunteer Immunity Statute (10 *Del. C.* § 8133(b)) and the business judgment rule. Therefore, he is entitled to judgment in his favor. Second, defendants contend that Newton fails to present any evidence supporting his claims.

Newton argues that the immunity statute does not apply because the statute excepts willful and unlawful conduct from its protections. Further, whether the statute even applies is a fact question for the jury to decide.

On the remainder of the claims, Newton argues that defendants misconstrue the law and disputes of material fact prevent entry of summary judgment.

## V.     *Standard of Review*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[50]  The moving party bears the initial burden of demonstrating that no material issues of fact are in dispute and that it is entitled to judgment as a matter of law.[51]  The court must view the record in a light most favorable to the nonmoving party, drawing all reasonable inferences in its favor.[52]

If the moving party makes the requisite showing, the burden shifts to the non-moving party.[53]  The opponent of a motion for summary judgment "must do more than simply show that there is some metaphysical doubt as to material facts."[54]  "If the facts permit reasonable persons to draw from them but one inference, the question is ripe for summary judgment."[55]

---

[50] Super. Ct. Civ. R. 56; *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 99–100 (Del. 1992).
[51] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).
[52] *Merrill*, 606 A.2d at 99–100.
[53] *Moore*, 405 A.2d at 681.
[54] *Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995) (citation omitted).
[55] *Id.*

## VI.    *Discussion*

### A.    *Volunteer Immunity Statute*

Defendants argue that Edgar as a member of Council,[56] is immune from liability under the Delaware Volunteer Immunity Statute, which provides: "No volunteer[57] of an organization shall be subject to suit directly, derivatively or by way of contribution for any civil damages under the laws of Delaware resulting from any negligent act or omission performed during or in connection with an activity of such organization."[58] Excepted from this immunity is "any act or omission constituting wilful [sic] and wanton or grossly negligent conduct."[59]

Defendants argue, and Newton does not dispute, that the Association is a non-profit within the meaning of the statute. Edgar, as a member of the Council, is not compensated. The LeParc Condominium Code of Regulations, Section 3.13 provides "No Council Member shall receive any compensation from the Condominium for

---

[56] Newton asserts his claims against Edgar personally as well. However, he presents no facts to show that Edgar took any action outside of his role as a member of Council. Accordingly, summary judgment is entered in favor of Edgar on Newton's claims for personal liability.

[57] A volunteer "is any trustee, ex officio trustee, director, officer, agent or worker who is engaged in an activity without compensation." 10 *Del. C.* § 8133(a)(5).

[58] 10 *Del. C.* § 8133(b).

[59] 10 *Del. C.* § 8133(d). The LeParc Code of Regulations, § 3.16 provides similar protection. Under this provision, unit owners are deemed to have agreed that no member of Council shall be liable to unit owners for "mistake of judgment, negligence or otherwise, except for their own individual willful misconduct or bad faith." OB, Ex. G at 0013.

15

acting as such."[60] Newton presents no evidence to show that despite this regulation, Edgar receives compensation from the Association.

Newton relies on the immunity exception to hold Edgar liable. He argues that at the time Edgar changed the locks, Ms. Anderson had just given birth and a jury could find that displacing a new mother and her infant amounted to willful disregard for her health. The problem for Newton is that, even if that were true and even if it could amount to willful conduct falling outside the statute (which is doubtful), he presented no evidence of Ms. Anderson's condition.[61] At this stage of the proceedings, he can no longer rely on allegations, he must come forward with facts supported by admissible evidence.[62] Having failed to do so, Edgar is entitled to judgment in his favor and the Motion is ***GRANTED*** as to the claims against him.[63]

## B.   *Civil Trespass and Criminal Mischief*

Newton's complaint attacks the contractor entering Unit-2 in connection with the repairs as civil trespass and criminal mischief because he did not give consent.

---

[60] OB, Ex. G at 0013, Code of Regulations, § 3.13.

[61] These allegations are not in the complaint. Newton raised them for the first time in his answering brief.

[62] *Brzoska*, 668 A.2d at 1364 (citation omitted).

[63] Defendants also argue that Edgar is entitled to the protections of the business judgment rule under 8 *Del. C.* § 141. The business judgment rule is applied in response to a claim of breach of fiduciary duties. Such a claim a "quintessential equitable claim." *Prospect Street Energy, LLC v. Bhargava*, 2016 WL 446202, at *4 (Del. Super. Jan. 27, 2016); *Boatswain v. Miller*, 2023 WL 355487, at *2 (Del. Super. Jan. 23, 2023). As such, it is well-settled that the Court of Chancery has exclusive jurisdiction over fiduciary duty claims even when only money damages are sought. *Prospect Street Energy*, 2016 WL 446202, at *4. Thus, this court does not have jurisdiction to hear claims of breach of fiduciary duties and the application of the business judgment rule. Thus, the Court does not address the merits of this argument.

Defendants argue that Newton, as the non-possessory landlord, lacks standing to assert trespass. Even if Newton has standing, defendants argue that they had the right to enter the premises under the Code of Regulations and Delaware law. Defendants further argue that Newton failed to present any evidence to support a claim of criminal mischief, as he did not file a police report and offers no evidence of damages.

Newton counters that he has standing because his tenant is not in privity of contract with the Association and defendants' reliance on privilege is misplaced. On his criminal mischief claim, Newton argues he seeks recovery for damage to his property and therefore, the fact that there is no police report does not defeat his claim.

To succeed on a claim for trespass, a plaintiff must prove that (1) the plaintiff has lawful possession of the land; (2) the defendant entered onto plaintiff's land without consent or privilege; and (3) resulting damages.[64]

The "possession" requirement was addressed by the Delaware Supreme Court in *State ex rel. Jennings v. Monsanto Co.*[65] The court first looked to Section 157 of the Restatement (Second) of Torts for the definition of possession:

> (a) is in occupancy of land with intent to control it, or (b) has been but no longer is in occupancy of land with intent to control it, if, after he has ceased his occupancy without abandoning the land, no other person has obtained possession as stated in Clause (a), or (c) has the right as

---

[64] *Williams v. Manning,* 2009 WL 960670, at *8 (Del. Super. Mar. 13, 2009); *Jasinski v. Singer,* 2024 WL 1257999, at *5 (Del. Ch. Mar. 25, 2024) (citations omitted).
[65] 299 A.3d 372 (Del. 2023).

17

against all persons to immediate occupancy of land, if no other person is in possession as stated in Clauses (a) and (b).[66]

The court went on to explain:

> The Second Restatement defines "occupancy" as "acts done upon the land as manifest a claim of *exclusive control* of the land, and indicate to the public that he who has done them has appropriated it." The Second Restatement also states that "[t]he word 'intrusion' is used throughout the Restatement of this Subject to denote the fact that the possessor's interest in the *exclusive possession* of his land has been invaded by the presence of a person or thing upon it without the possessor's consent." Under Delaware law, "[o]nly a person in possession of the property may allege a trespass action."[67]

The undisputed evidence in the record is that Unit-2 was possessed by Newton's tenant, Ms. Gullette. While Newton had the right to occupy the unit, he did not so occupy it at the time of the alleged trespass. Because Newton was not in possession, let alone exclusive possession, of Unit-2, he has no standing to assert a claim for trespass.[68]

The elements of the crime of criminal mischief are: (1) the defendant damages tangible property of another person; and (2) the defendant acted intentionally or

---

[66] *Jennings,* 299 A.3d at 388.

[67] *Id.* (emphasis in original).

[68] *See, Frye v. Estate of Raphaelson*, 2023 WL 5624717, at *12 (Del. Ch. Aug. 31, 2023) (finding that owner of property lacked standing to assert trespass claim where the property was occupied by another person). Defendants rely on *Jasinski v. Singer,* 2024 WL 1257999 (Del. Ch. Mar. 25, 2024) to argue Newton does not have standing because he does not occupy Unit-2. Newton attempts to distinguish *Jasinski* on the ground that the plaintiff there (the tenant) was in privity of contract with the landowner-defendant. Here, he argues, because his tenant is not in privity of contract with the Association, she could not bring a trespass claim and accordingly, only he as the landowner has standing to do so. But the *Jasinski* ruling was not based on privity. The tenant had standing because he was in possession of the property. *Id.* at *2-3; *see Frye*, 2023 WL 5624717, at *12.

18

recklessly. But, Newton has no standing to enforce or seek recovery under a criminal statute.[69] Thus, his claim as stated fails.

At oral argument, Newton asserted that if a defendant acted in a manner that would constitute a violation the criminal mischief statute, it is evidence of the defendant's liability for the damage caused. Accepting this argument for purposes of this Motion and assuming that Unlimited Construction acted intentionally, Newton still fails to make any showing of damage to the property. He offers no evidence of harm or diminution in value to Unit-2 due to the work performed by Unlimited Construction. Accordingly, Newton failed to sustain his claim and the Motion is *GRANTED* on this Count.

## C. *Legal Fees and Meeting Minutes*

Newton's claims in Count II arise under chapter 81 of title 25 of the Delaware code. Without identifying any specific code section that applies to his claims, Newton alleges that the Association and Premier[70] charged attorneys' fees to the accounts for his units, in violation of the statute because it is impermissible to charge an owner's account for the ordinary business of the Association. He further asserts that the charges are in violation of the American Rule, which provides that, absent bad faith,

---

[69] *Chang v. Mayo*, 2016 WL 3640260, at *3 (Del. Super. June 28, 2016) (Delaware law "provides that private citizens do not have standing to bring criminal actions under Title 11 of the Delaware Code." citing *Brett v. Berkowitz,* 706 A.2d 509, 512 (Del. 1998)).

[70] He also asserts these claims against Edgar, but as noted above, judgment is entered against Newton on his claims against Edgar under the Volunteer Immunity Statute.

contractual or statutory fee provisions, each party to litigation pays its own attorneys' fees.

Defendants argue that Premier, as the agent for the Association cannot be liable to Newton. They further argue that the Delaware Uniform Common Interest Ownership Act (the "Act") and the Association's Code of Regulations permit imposing attorneys' fees in certain circumstances.

In response, Newton argues about the negative impact of the assessment of attorneys' fees, but does not respond to the substantive arguments.

Turning first to Premier, Newton does not explain how the property manager, engaged to perform financial, administrative, and community management services for the Association, is responsible for the imposition of fees that allegedly violate the Act. As the Premier contract shows, it takes direction from Council.[71] Newton presents no legal theory (or evidence) to hold Premier responsible for fees assessed by the Association.[72] Accordingly, the Motion is **GRANTED** and judgment is entered in favor of Premier.

Construing the record in Newton's favor as the non-moving party, the Court considers his claim for attorneys' fees as a request for a declaratory judgment that the

---

[71] The contract refers to the Council as the "Board." OB, Ex. G-1 at 0051-59.
[72] To the extent Newton's claim could be construed as a breach of contract, an agent for a disclosed principal is not liable, only the principal is liable for the breach. *Harris v. Dependable Used Cars, Inc.*, 1997 WL 358302, at *1 (Del. Super. Mar. 20, 1997).

20

Association is without authority to assess such fees. The Association contends that under the Code of Regulations and the Act, it is authorized to assess attorneys' fees in certain circumstances. Here, it argues it properly assessed attorneys' fees incurred as a result of Newton's improper removal of structural supports in Unit-2.

The LeParc Code of Regulations permits the Association to assess certain fees against a unit owner. Section 5.5(b)(1) imposes liability on a unit owner for all damage to any other units or the common areas resulting from his failure or neglect to make any repairs required by the Code.[73] Under Section 9.1(a), unit owners are also liable for the "expense of all maintenance, repair or replacement rendered necessary by his act, neglect, or carelessness...."[74] Finally, Section 9.1(b) awards the prevailing party in any proceedings shifting of attorneys' fees.[75]

Section 81-316 of the Act provides:

> (a) The association has a statutory lien on a unit for any assessment levied against that unit or fines imposed against its unit owner. Unless the declaration otherwise provides, fees, charges, late charges, fines, and interest charged pursuant to § 81-302(a)(10),[76] (11), and (12) of this title, and any other sums due the association under the declaration, this chapter or as a result of an administrative or judicial decision,

---

[73] OB, Ex. G-1 at 0021.

[74] *Id.* at 0033.

[75] *Id.* The Association asserts that this section permits it to assess the attorneys' fees incurred in corresponding with a unit owner regarding any default or delinquent assessment. This section, however, does not contain such a provision.

[76] The Association relies on Section 81-302(a)(10) for authority to impose attorneys' fees, but that section empowers an association to assess fees relating to use, rental, or operation of common elements. The Association does not contend that the attorneys' fees at issue relate to use or operation of common area. Similarly, the Associations' reliance on Section 81-307 is misplaced. That section does not authorize assessment of attorneys' fees.

together with court costs and reasonable attorneys' fees incurred in attempting collection of the same, are enforceable in the same manner as unpaid assessments under this section.

While the Association has established that the Act and the Code of Regulations grant it authority to assess certain fees, the Association has not established that the attorneys' fees at issue here were properly charged to Newton. The ground for assessing the fees to Newton is his alleged improper alteration of Unit-2 causing structural defects, which is the subject of the Association's counterclaim. The Association has not established that Newton improperly made alterations or that the attorneys' fees arose out of Newton's actions. Newton's claim relating to attorneys' fees is best left for resolution in the context of the Counterclaims. Accordingly, the Association's Motion on this ground is **DENIED**.

Newton's next claim is that he has been wrongfully denied access to LeParc's meeting minutes. The Association argues that Newton's only request for meeting minutes was written on a napkin and presented to a Premier representative, who he says ignored his request.[77]

There is no dispute that the Association is required to maintain minutes of meetings of its members and the Council.[78] It is also undisputed that the Association is obligated to make "all records kept . . . available for examination and copying by a

---

[77] Newton Dep. at 136-137.
[78] 25 *Del. C.* § 81-318.

22

unit owner . . . so long as the request is made in good faith and for a proper purpose related to the owner's membership in the association."[79]

The Association presented evidence that LeParc unit owners have access to meeting minutes *via* Premier's unit owner portal.[80] Newton questions whether access to the documents through the portal is reasonable under the Act, which, he says, raises a dispute of material fact. He also argues that whether his request was proper is a disputed fact as well.

Newton's position suffers from several defects. First, to the extent his claim may be construed as seeking a declaration as to his rights to the documents, there is no dispute.[81] The Association has not challenged his right of access as a unit owner and has not denied access based on the form of a request. Thus, his claim is moot. Second, Newton fails to point to any evidence to contradict the Association's evidence that the minutes are available through the portal or that he attempted to access the minutes through the portal, but was denied. Finally, Newton cites no authority that granting access through a portal is somehow in conflict with the Association's

---

[79] 25 *Del. C.* § 81-318(b). Confidential documents and records from executive session of the Council may be withheld. 25 *Del. C.* § 81-318(c)(7).

[80] D.I. 161, Response 17.

[81] To the extent that Newton is seeking an order compelling production of the meeting minutes, Newton fails to address how this court has jurisdiction to grant such relief. *See In re COVID-Related Restrictions of Religious Srvs.,* 285 A.3d 1205, 1226, n.4 (Del. Ch. 2022) (mandatory injunction compels a party to take affirmative action), *Dayton v. Collison,* 2018 WL 565304, at *2 (Del. Super. Jan. 24, 2018) (Court of Chancery has exclusive jurisdiction to grant injunctive relief).

statutory duties.  As such, his arguments fail and summary judgment is ***GRANTED*** in the Association's favor.

### D.    *Changing Locks*

Newton's claim relating to the locks allegedly being changed in Unit-4 arises in Counts II and III.  He argues that the Association lacks authority to exercise self-help and by doing so, it constituted a constructive eviction.

The Association asserts that Newton's claim fails because he was advised of the emergency situation in Building 5201 and that the tenants needed to vacate the premises until repairs were completed.  It further argues that to the extent locks were changed, it occurred after the County posted the UNSAFE notices on the doors.  Finally, it argues that there was no constructive eviction.

Self-help is any "attempt to redress a perceived wrong by one's own action rather than through the normal legal process."[82]  Under Delaware law, "landlords … cannot use the remedy of self-help."[83] "The purpose of the prohibition on the use of self-help is to force landlords to invoke proper legal remedies through a court of law, rather than engaging unilaterally in conduct that could lead to breaches of the

---

[82] *Buckeye Partners, L.P. v. GT USA Wilmington LLC,* 2020 WL 2551916, at *9 (Del. Ch. May 20, 2020).

[83] *Id.* (citing *Affordable Autos, Inc. v. Dietert*, 2016 WL 1169244, at *5 (Del. Super. Mar. 24, 2016)); *Carriage Realty P'ship v. All-Tech Auto., Inc.*, 2001 WL 1526301, at *8 (Del. Ch. Nov. 27, 2001).

peace."[84]  "Landlords wrongfully use self-help if they physically retake possession of the leased premises or exclude the tenant, such as by changing the locks."[85]

Under the Delaware Landlord-Tenant Code, if a condition exists "which deprives the tenant of a substantial part of the benefit or enjoyment of the tenant's bargain" and the condition is not remedied within 15 days, the tenant has the right to terminate the rental agreement.[86]

Newton's arguments again fail.  He relies on the landlord tenant relationship for the basis of his claims, but *he* is the landlord, not the Association.  Thus, neither the code nor the self-help prohibition applies.

Further, Newton knew of the structural deficiencies in the building *via* the December 22, 2022 and December 29, 2022 letters, which he acknowledges receiving.[87]  Yet, his tenant continued to enter Unit-4.

He testified that the locks were changed in January, "talking about an emergency."[88]  The New Castle County Police incident report from January 16, 2023, on which Newton relies, shows when the locks were changed.[89]  This was *after* the County declared the units UNSAFE.  Thus, to the extent the locks were changed, the

---

[84] *Buckeye Partners,* 2020 WL 2551916, at *9 (citation omitted).
[85] *Id.* at *9 (citation omitted).
[86] 25 *Del. C.* § 5302(c).
[87] Letters; Newton Dep. at 123.
[88] Newton Dep. at 72.
[89] OB, Ex. F at 009.

County declared that the units were not to be occupied, not the Association.  Newton offers no evidence to challenge the County's determination.[90]

Newton failed to show a dispute of material fact and accordingly, summary judgment is *GRANTED* in the Association's favor.

**VII.**     *Conclusion*

Except for Newton's claim relating to the assessment of attorneys' fees, the defendants showed that there are no disputes of material facts and they are entitled to judgment as a matter of law.  The burden then shifted to Newton to establish that material facts remain in dispute.  He failed to meet that burden and therefore, the Motion is GRANTED on Counts I and III and GRANTED in Part on Count II.  The Motion is DENIED on the claim relating to attorneys' fees because the Association did not establish that it is entitled to judgment as a matter of law.


**IT IS SO ORDERED**.

/s/Kathleen M. Miller
Kathleen M. Miller, Judge

---

[90] At oral argument, Newton claimed that the units were declared UNSAFE because the contractor failed to obtain the proper permits.  He relies on the UNSAFE notice, which stated in part, that "No Work, Repair, or Demolition may continue on this Structure until all Permits have been obtained[.]" The Association presented evidence that all permits were obtained prior to the UNSAFE notice, which Newton does not dispute. *See* OB, Ex. A at 051, 55-56, 062, 068, 094-097.  Newton must do more than raise a "metaphysical doubt as to material facts." *Brzoska*, 668 A.2d at 1364.  Having failed to do so, this argument does not preclude entry of summary judgment.